**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HEALTHY GULF
935 Gravier Street
Suite 700
New Orleans, LA 70112,

Case No.

SIERRA CLUB
2101 Webster Street
Suite 1300
Oakland, CA 94612,

FRIENDS OF THE EARTH
1101 15th Street, NW
11th Floor
Washington, DC 20005,

TURTLE ISLAND RESTORATION NETWORK
9255 Sir Francis Drake Boulevard,
Olema, CA 94950,

*Plaintiffs*,

v.

DOUG BURGUM, in his official capacity as
SECRETARY OF THE INTERIOR
1849 C Street NW
Washington, DC 20240,

PETE HEGSETH, in his official capacity as
SECRETARY OF DEFENSE
1000 Defense Pentagon
Washington, DC 20301-1000,

BROOKE ROLLINS,
in her official capacity as Secretary of the U.S.
Department of Agriculture
1600 Independence Ave., SW
Washington, D.C. 20250,

DANIEL P. DRISCOLL,
in his official capacity as Secretary of the
Department of the Army

101 Army Pentagon
Washington, DC 20310,

PIERRE YARED,
in his official capacity as Acting Chair of the
Council of Economic Advisers
1600 Pennsylvania Ave., NW
Washington, D.C. 20500,

LEE ZELDIN,
in his official capacity as Administrator of the
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW,
Mail Code: 1101A
Washington, DC 20460,

NEIL JACOBS,
in his official capacity as Administrator of the
National Oceanic and Atmospheric Administration
1401 Constitution Ave., NW, Room 5128
Washington, DC 20230,

*Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      On March 31, 2026, the Secretary of the Interior, the Secretary of Agriculture, the Secretary of the Army, the Chairman of the Council of Economic Advisors, the Administrator of the Environmental Protection Agency, and the Administrator of the National Oceanic and Atmospheric Administration (calling themselves the "Endangered Species Committee")[1] briefly convened to grant an exemption purporting to excuse the Bureau of Ocean Energy Management

---

[1] These six Defendants refer to themselves as the "Endangered Species Committee." Conservation Groups do not agree that the "Endangered Species Committee," as detailed in the ESA, 16 U.S.C. §§ 1536(e)–(o), was properly constituted or convened for the decision challenged in this case, but use the term "Endangered Species Committee" or "Committee" or "Committee Defendants" in this complaint to collectively refer to these six Defendants.

(BOEM) and the Bureau of Safety and Environmental Enforcement  (BSEE) from compliance with the procedural and substantive requirements of the Endangered Species Act when "implementing [] Gulf of America Oil and Gas activities" ("Exemption").

2.      The Committee issued its Exemption without following any of the detailed substantive or procedural requirements for decision-making set forth in the Endangered Species Act, including among other things, the requirement that the Secretary of the Interior convene the Committee only in rare circumstances where there is an irreconcilable conflict between protecting listed species and a proposed agency project. No such conflict exists with respect to oil and gas development in the Gulf of Mexico.[2] In fact, production in the Gulf is at record levels even with protections in place. In short, the Committee's sweeping Exemption is arbitrary and capricious and contrary to and in excess of authority under the Administrative Procedure Act (APA) and the Endangered Species Act (ESA) and its implementing regulations.

3.      The Committee's unprecedented Exemption is founded entirely on an arbitrary National Security Finding ("Finding"), issued by the Secretary of Defense on March 13, 2026, asserting that ongoing or future "litigation threatens national security." The Defense Secretary's Finding provided no evidence of an irreconcilable conflict between ESA protections and oil and gas activities in the Gulf. Instead, it posited that a court might grant relief in the future that might halt oil and gas development, necessitating an exemption for "all oil and gas activities in the Gulf of America" to protect against this unrealized "threat" to national security from the federal courts. The Defense Secretary's Finding, however, fails to provide any evidence in support of

---

[2] On January 20, 2025, President Trump issued Executive Order 14172 to rename this area as the "Gulf of America." 90 Fed. Reg. 8629 (Jan. 31, 2025). Unless quoting from a document, this Complaint refers to this area as the "Gulf of Mexico" or "Gulf" in accordance with the historic name and as reflected in many of the relevant documents.

this conclusion and is arbitrary and capricious, in violation of the APA and the ESA.

4.      The Defense Secretary's arbitrary Finding and the Committee's unlawful Exemption allow all oil and gas activity in the Gulf to proceed regardless of whether those activities will jeopardize more than two dozen threatened and endangered species or destroy their critical habitat across a swath of ocean as large as the State of Montana, despite the fact that current oil production activities in the Gulf are not constrained or prohibited by the need to comply with the ESA.

5.      To the contrary, under current requirements, production has not halted or even slowed. For example, deepwater production in the Gulf has increased over 10% every year, on average, since 1985. On April 1, 2026, the Department of the Interior reported that U.S. oil production from the Gulf "surpasses all previous annual production levels," particularly in deepwater areas. The Defense Secretary's Finding itself admits that the ESA currently "allow[s] Federal agencies to issue permits, approve plans, and take other similar actions necessary for Gulf oil and gas development." Likewise, both the Department of the Interior and the oil industry have recently affirmed to federal courts that the existing system is adequate and provides the certainty necessary for their operations.

6.      The Gulf is home to some of the nation's most treasured wildlife, including more than two dozen species protected as either threatened or endangered under the ESA. They include the critically imperiled Rice's whale—with only about 50 individuals remaining, Florida manatees, the endangered whooping crane – one of the first species to be protected under the ESA, and the Kemp's ridley sea turtle—the most endangered sea turtle in the world.

7.      The oil and gas operations purportedly covered by the Committee's Exemption harm these threatened and endangered species, as well as the broader Gulf ecosystem, in a

variety of ways on a daily basis. These harms sometimes become catastrophic, as when the Deepwater Horizon oil drilling rig exploded in 2010. The disaster killed 11 crew members and caused 4.9 million barrels (more than 200 million gallons) of oil to spew underwater for 87 days, spreading throughout the Gulf and coating wildlife and ecosystems. The spill killed countless marine mammals, sea turtles, fish, birds, and other wildlife. Scientists continue to discover new, long-term harms from the spill to this day.

8.    The unlawful Finding and Exemption would effectively absolve oil and gas activities from the consequences of these types of catastrophic events as well as the need to address the chronic harms to listed species caused by more routine oil and gas exploration and development. Moreover, the challenged Finding and Exemption arbitrarily collapse an umbrella of protection that benefits the entire Gulf, threatening unprecedented and incalculable harm to millions of fish, whales, seabirds, turtles, corals, and the people, including Plaintiffs, whose well-being and livelihoods depend on thriving wildlife and a clean and healthy Gulf ecosystem.

9.    Plaintiffs Healthy Gulf, Sierra Club, Friends of the Earth, and Turtle Island Restoration Network ask this Court to declare that the Finding and Exemption are arbitrary, capricious and contrary to law, without observance of procedure required by law, and in excess of statutory authority, in violation of the APA and ESA, and to vacate both decisions.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 704 (APA).

11.    Venue properly vests in this District pursuant to 28 U.S.C. § 1391(b) and (e)(1) because Defendants reside in this district, the challenged decisions were made in the district, a plaintiff resides in this District, and a substantial part of the events and omissions which gave

rise to this action occurred in this District.

12. This Court has authority to grant Plaintiffs' requested relief pursuant to the APA, 5 U.S.C. § 706(2), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

**PARTIES**

13. Plaintiff HEALTHY GULF is a network of community, conservation, environmental, and fishing groups and individuals committed to empowering people to protect and restore the natural resources of the Gulf of Mexico. Healthy Gulf's purpose is to collaborate with and serve communities who love the Gulf of Mexico by providing research, communications, and coalition-building tools needed to reverse the long-pattern of over-exploitation of the Gulf's natural resources. Healthy Gulf has been actively involved in efforts to strengthen oversight of the offshore oil and gas industry and end new oil and gas leasing in this region. Healthy Gulf is headquartered in New Orleans, Louisiana, with offices in Pensacola, Florida and Madison, Mississippi. Healthy Gulf's members live in the five Gulf states of Texas, Louisiana, Mississippi, Alabama, and Florida, and nationwide. For example, a member of Healthy Gulf is a small business owner of a Ship Island excursion company which offers cruises to Ship Island, offshore from Mississippi, as well as dolphin watching cruises in the Gulf. The business has been in his family for generations. He relies on a healthy environment, clean waters, and healthy marine life to continue the family business which has already been adversely impacted by oil and gas development activities in the Gulf, as well as resulting climate change. Healthy Gulf brings this action for itself and as representative of its members.

14. Plaintiff SIERRA CLUB is a not-for-profit organization dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry

6

out these objectives. Sierra Club is one of the oldest and largest conservation groups in the country, with more than 600,000 members nationally in 67 chapters in all 50 states, the District of Columbia, and Puerto Rico; including more than 2,000 members in the District of Columbia Chapter. Sierra Club members use the public lands and waters throughout the Gulf, including those that would be affected by oil and gas activities, for quiet recreation, aesthetic pursuits, and spiritual renewal. Sierra Club members further observe and enjoy wildlife found in the Gulf that may be harmed by oil and gas activities, including threatened and endangered species such as sperm whales and green sea turtles. For example, one member who has visited or lived on and near the Gulf of Mexico for more than 60 years, regularly spends time boating and fishing offshore in the Gulf's deep waters for a variety of species, such as red snapper, redfish, black drum, cobia, and triggerfish. During these trips, he looks for Rice's whales and enjoys seeing sea turtles, dolphins, and other marine species. He also enjoys camping with his family on the Gulf's barrier islands. And he has actively advocated for Gulf sturgeon protections. Sierra Club brings this action on behalf of its members.

15.     Plaintiff FRIENDS OF THE EARTH is a nonprofit organization with an office in Oakland, California, and a headquarters in Washington, D.C. For more than 50 years, it has championed the causes of a clean and sustainable environment, protection of the nation's public lands and waterways, and the exposure of political malfeasance and corporate greed. Friends of the Earth's Climate, Energy & Oceans Program works to fight industrialization of the ocean in all its forms, and has won regional, national, and international limits on air, water, and oil pollution from cruise ships, cargo ships, oil tankers, ferries, and recreational watercraft. Friends of the Earth has more than 151,000 members and 4.8 million activists, including members who live and recreate along the Gulf of Mexico coastline. For example, one member (who is also a

member of Sierra Club) owns property along and regularly visits the Gulf of Mexico with his family to fish and recreate. He enjoys fishing, surfing, viewing wildlife habitats, and visiting rescued turtles on South Padre Island. Friends of the Earth brings this action on behalf of its members.

16.     Plaintiff TURTLE ISLAND RESTORATION NETWORK (TIRN) is a nonprofit organization with offices in California and Texas. TIRN has been a leading advocate for the world's oceans and marine wildlife for more than 30 years. TIRN and its members work to protect and restore populations of endangered sea turtles and other vulnerable marine creatures—such as whales and dolphins—as well as marine biodiversity and ecosystems throughout the Gulf and along the Atlantic Coast. TIRN has over 200,000 members and supporters, including members who live and recreate along the Atlantic and Gulf coasts. For example, one member—a retired Superintendent of Flower Garden Banks National Marine Sanctuary in the Gulf—has lived at, studied, and dived in the Gulf for over 25 years. He regularly takes boat trips to various areas of the Gulf, including the Sanctuary, to SCUBA dive, participate in research, and look for sea turtles, Rice's whales, and other wildlife. TIRN brings this action on behalf of its members.

17.     ESA-listed species, and the Gulf ecosystem more generally, are harmed by the offshore oil and gas industry, which has drilled tens of thousands of active wells, installed thousands of production platforms, surveyed hundreds of thousands of miles of tacklines with seismic airguns searching for oil and gas deposits, constructed over 25,000 miles of active underwater pipelines, and which conducts hundreds of thousands of vessel trips to support and service all of this infrastructure annually. These activities inflict harm to ESA-listed species, other wildlife, and the environment, including oil spills, vessel strikes, noise (from vessels, construction, and general operations), marine debris and other water pollution, and underwater

explosions.

18.     Plaintiffs and Plaintiffs' members regularly use, enjoy, and benefit from the marine environment of the Gulf. Plaintiffs and Plaintiffs' members also regularly use, enjoy, and benefit from the presence of healthy marine life—including threatened and endangered species—within the Gulf for recreational, aesthetic, commercial, scientific, and environmental purposes, such as whale watching, scientific study, boat touring, underwater diving, fishing, and photography. The ability of Plaintiffs and Plaintiffs' members to pursue these interests hinges not only on the well-being of threatened and endangered species that live, migrate, feed, and breed in areas affected by oil and gas activities in the Gulf, but also on the health of the marine ecosystems on which these species depend.

19.     Defendants' unlawful decision to grant an Exemption for all oil and gas activities in the Gulf based on an arbitrary Finding that such an exemption is necessary for national security has caused and is causing Plaintiffs' members harms connected to their substantive conservation, recreational, scientific, and aesthetic interests. The Exemption and Finding remove vital protections for some of the country's most imperiled and treasured wildlife and allows unfettered activities that harm these species and the Gulf environment. Plaintiffs' members rely on Defendants to comply with the requirements of the ESA to guide federal authorizations of Gulf oil and gas activities to protect endangered and threatened species from harmful effects of those activities.

20.     The interests of Plaintiffs and Plaintiffs' members have been, are being, and will be adversely affected by Defendants' violations of federal law, as described herein. These harms can only be remedied if the Court vacates the unlawful Exemption and Finding. Plaintiffs have no other adequate remedy at law.

21.     Defendant DOUG BURGUM, Secretary of the Interior, is sued in his official capacity. Secretary Burgum is the chairman of the Endangered Species Committee.

22.     Defendant PETER HEGSETH, Secretary of Defense, is sued in his official capacity. Secretary Hegseth made the Finding that an Exemption was necessary for reasons of national security.

23.     Defendant BROOKE ROLLINS, Secretary of the U.S. Department of Agriculture, is sued in her official capacity as a member of the Endangered Species Committee.

24.     Defendant DANIEL P. DRISCOLL, Secretary of the Department of the Army, is sued in his official capacity as a member of the Endangered Species Committee.

25.     Defendant PIERRE YARED, Acting Chair of the Council of Economic Advisers, is sued in his official capacity as a member of the Endangered Species Committee.

26.     Defendant LEE ZELDIN, Administrator of the U.S. Environmental Protection Agency is sued in his official capacity as a member of the Endangered Species Committee.

27.     Defendant NEIL JACOBS, Administrator of the National Oceanic and Atmospheric Administration, is sued in his official capacity as a member of the Endangered Species Committee.

**STATUTORY BACKGROUND**

I.     ENDANGERED SPECIES ACT OVERVIEW

28.     Congress enacted the ESA in 1973 in response to the extinction crisis to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174, 180 (1978). The language and history of the Act reflect Congressional

10

intent "to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

29.    Congress defined "conservation" under the ESA as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary;" that is, when the species has recovered and no longer needs the protection of the ESA. 16 U.S.C. § 1532(3).

30.    In broad strokes, the ESA seeks to protect and recover imperiled species and populations by first listing them as threatened or endangered based on enumerated statutory factors. *Id.* § 1533(a)(1)(A)–(E); *see id.* § 1532(6), (20). The Act further provides for the designation of protected critical habitat for threatened and endangered species. *Id.* § 1533(a)(3)(A)(i).

31.    To effectuate these goals, Congress included Section 7(a)(2) of the ESA, which requires each federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Id.* § 1536(a)(2).

32.    The ESA and its implementing regulations establish an interagency consultation process to assist federal agencies in complying with this duty. An agency must consult with the appropriate expert wildlife service—either the National Marine Fisheries Service ("NMFS") for marine species or the U.S. Fish and Wildlife Service ("FWS") for terrestrial and freshwater species—under Section 7 whenever it takes an action that "may affect" a threatened or endangered species or critical habitat. *Id.* § 1536(a)(2); 50 C.F.R. § 402.14(a). In fulfilling the requirements of Section 7, agencies must "use the best scientific and commercial data available."

11

16 U.S.C. § 1536(a)(2).

33.    If the agency taking the action (the action agency) concludes the action may affect listed species or their critical habitats, it must initiate formal consultation with NMFS and/or FWS (the expert agency), unless the action agency determines and the expert agency concurs in writing that the action is "not likely to adversely affect" any listed species or critical habitat. 50 C.F.R. §§ 402.13(c), 402.14(a), (b)(1).

34.    Formal consultation requires NMFS and FWS to: 1) evaluate the current status and environmental baseline of affected species and critical habitats, 2) assess the effects of the action and cumulative effects on those species and habitats, and 3) analyze whether the effects of the action, when added to the environmental baseline together with any cumulative effects, is likely to jeopardize the continued existence of the species or adversely modify their critical habitats. *Id.* § 402.14(g). At the conclusion of formal consultation, NMFS and/or FWS issues a biological opinion assessing the effects of the action and making a formal determination regarding whether the action is likely to jeopardize the continued existence of the species or adversely modify their critical habitats. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(e), (h).

35.    Longstanding ESA regulations define "jeopardize the continued existence of" as, "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. These regulations also define "destruction or adverse modification" of critical habitat as "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id*.

36.    If NMFS and/or FWS conclude that the proposed action is likely to jeopardize a

listed species or result in adverse modification of its critical habitat, it must propose reasonable and prudent alternatives (RPAs), if available, that will mitigate the proposed action to avoid jeopardy and adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3); 50 C.F.R. §§ 402.02, 402.14(h)(2). RPAs must: 1) be capable of being implemented in a manner consistent with the intended purpose of the action, 2) be within the scope and authority of agency's jurisdiction, 3) be economically and technologically feasible, and 4) avoid the likelihood of jeopardizing the continued existence of the species. 50 C.F.R. § 402.02.

37.    Section 9 of the ESA prohibits "take" of endangered species by any person, which includes federal agencies. 16 U.S.C. § 1538(a)(1). "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." *Id.* § 1532(19).

38.    If NMFS and/or FWS concludes that the proposed action (or an RPA) will not jeopardize a listed species or adversely modify its critical habitat, but will incidentally take members of a listed species, it must include with the biological opinion an "incidental take statement" that specifies the amount of take that may occur without causing jeopardy or adverse modification of critical habitat, as well as the measures required to limit take. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

39.    For more than 50 years, the ESA consultation process has assisted federal agencies in carrying out their activities without pushing species to extinction. The overwhelming majority of those consultations have concluded that an agency action can either proceed without causing jeopardy or can proceed so long as the federal agency implements one or more RPAs that alter the project in ways that sufficiently avoid or mitigate the harm. Head-to-head conflicts—where an action cannot proceed and there are no measures that would avoid jeopardizing the species—are exceptionally rare.

13

II.     THE ENDANGERED SPECIES COMMITTEE UNDER THE ESA AMENDMENTS

40.     Congress amended Section 7 in 1978 in response to one of these exceptional circumstances. In *Tennessee Valley Authority,* the Supreme Court halted construction of the partially completed Tellico Dam after holding that the federal project violated the ESA by causing the extinction of a fish species. 437 U.S. at 173–74, 193–95. In response, Congress installed a relief valve in Section 7, giving an "Endangered Species Committee" the authority to grant an exemption from ESA requirements only if, based on an application for an exemption and after a careful and rigorous review process, the Committee found an "irresolvable conflict" where a vital federal agency could not proceed without jeopardizing a species (i.e., that there were no alternatives). Pub. L. No. 95-632, § 1, 92 Stat. 3751 (1978); 16 U.S.C § 1536 (e)–(o); S. Rep. No. 418, 97th Cong., 2d Sess. 17 (1982).

41.     Under the ESA, the Committee is led by the Secretary of the Interior and composed of six other officials: the Secretaries of Agriculture and the Army, the Chairman of the Council of Economic Advisers, the Administrators of the Environmental Protection Agency and the National Oceanic and Atmospheric Administration, and a person appointed by the President from the state affected by an application for an exemption. 16 U.S.C. § 1536(e)(3), (g)(2)(B); 50 C.F.R. § 451.03(b). When no State is affected, the Interior Secretary shall ask the President to appoint an individual with expertise relevant to the application. 50 C.F.R. § 451.03(b)(2).

42.     The ESA allows only a Federal agency, the governor of a state in which an agency action will occur, or a permit or license applicant to apply for an exemption in writing. 16 U.S.C. § 1536(g)(1); 50 C.F.R. § 451.02(c). Section 7(g)(1) specifies that an applicant may apply if, after consultation, the biological opinion indicates that "the agency action would violate subsection [7](a)(2)." *Id.* The written application must include "a description of the consultation process carried out pursuant to subsection (a)(2)" and "a statement describing why such action

14

cannot be altered or modified to conform with the requirements of subsection (a)(2)." 16 U.S.C. § 1536(f).

43.    After receiving such an application, the Secretary must promptly publish notice of the application in the Federal Register, 50 C.F.R. § 451.02(h), and then (generally within 20 days) must make a threshold determination to confirm that, among other things: (1) the applicant has completed the consultation process in good faith, including by making a "reasonable and responsible effort" to develop and "fairly consider" reasonable and prudent alternatives that would not violate Section 7(a)(2), and (2) the applicant has, to the extent determinable, refrained from making any irreversible or irretrievable commitments of resources that would violate ESA Section 7(d). 16 U.S.C. § 1536(g)(3)(A). If the applicant has not met any of these requirements, the Secretary "shall" deny the application. *Id*. § 1536(g)(3)(B).

44.    If the Secretary makes a positive threshold determination, the Secretary will notify the applicant and then begin to gather information necessary to prepare a report for the Committee within 140 days. 50 C.F.R. §§ 452.03–.04, 452.08(b). To collect that relevant information, the Secretary must hold a hearing before an Administrative Law Judge pursuant to sections 554, 555, and 556 of the APA, *id*. § 452.05, including the opportunity for participation from the parties and from intervenors, *id*. § 452.06; 16 U.S.C. § 1536(g)(4).

45.    After the close of the hearing, the Secretary must prepare a report on the application discussing: (1) any reasonable and prudent alternatives to the proposed action and the benefits of all alternatives (including those not limited to the original project purposes or by agency jurisdiction) as compared to the proposed action, (2) a summary of evidence regarding whether the proposed action serves the public interest and is of national or regional significance, (3) mitigation and enhancement measures that should be considered by the Committee, and (4)

15

whether any irreversible or irretrievable commitments of resources occurred in violation of ESA Section 7(d). 16 U.S.C. §§ 1536(g)(4)–(5), 1532(1).

46.　Within 30 days of receiving the Secretary's report, the Committee must make a final determination on the exemption application. *Id.* § 1536(h)(1). The Committee may grant an application for an exemption if, by vote of at least five of its seven members, it determines that: (1) there are no reasonable and prudent alternatives, (2) the benefits of the proposed action "clearly outweigh" the benefits of alternatives (again, not limited to the original project purpose or the agency's jurisdiction) and serve the public interest, (3) the proposed action is of regional or national significance, and (4) neither the applicant nor the action agency has made any irreversible or irretrievable commitments of resources in violation of ESA Section 7(d). *Id.* § 1536(h)(1)(A).

47.　An exemption is permanent unless the Secretary later finds, based on the best available science, that the exemption would result in the extinction of a species that was not the subject of consultation nor identified in a biological assessment for the action and the Committee then determines within 60 days of the Secretary's finding that the exemption should not be permanent. *Id.* § 1536(h)(2)(B).

48.　In granting an application for an exemption, the Committee must also establish "reasonable mitigation and enhancement measures, including, but not limited to, live propagation, transplantation, and habitat acquisition and improvement, as are necessary and appropriate to minimize the adverse effects of the agency action upon the endangered species, threatened species, or critical habitat concerned." *Id.* § 1536(h)(1)(B).

49.　The Committee's final determination on an application "shall be considered final agency action" under the APA. *Id.* § 1536(h)(1).

50.    The plain language of 7(a)(2) makes clear that the only vehicle for obtaining an exemption from the prohibition that federal agencies must not cause jeopardy or adverse modification is a determination under Section 7(h) and exemptions must be granted by the Committee. 16 U.S.C. § 1536(a)(2) (jeopardy and adverse modification prohibitions apply "unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section"). Likewise, Section 7(o) expressly states that the only vehicle for obtaining an exemption from the prohibition against taking a listed species is a determination under Section 7(h). *Id*. § 1536(o) ("[A]ny action for which an exemption is granted under subsection (h) shall not be considered to be a taking of any endangered species or threatened species with respect to any activity which is necessary to carry out such action.").

51.    The ESA only identifies one narrow exception to the requirement that exemptions be granted by the Committee through the procedures described above. Section 7(p) provides that in a Presidentially declared "major disaster area . . . the President is authorized to make the determinations required by subsections (g) and (h) of this section" in "an emergency situation which does not allow the ordinary procedures of this section to be followed" and requires that "the Committee shall accept the determinations of the President." *Id*. § 1536(p)

52.    Notwithstanding this singular exception, the ESA includes two other exceptional circumstances that qualify *some of* the Committee's discretion when considering an exemption. First, Section 7(j) requires the Committee to grant an exemption "if the Secretary of Defense finds that such exemption is necessary for reasons of national security." 16 U.S.C. § 1536(j). Even so, Section 7(j) still requires the Committee to make the ultimate exemption determination. And Section 7(j) does not expressly allow the Committee to skip the ordinary procedures required under Sections 7(g) and 7(h). Until March 2026, the Defense Department had not

invoked, and the Committee had not considered, this provision in the nearly 48 years since it was adopted.

53.     Second, under Section 7(i), the "Committee shall be prohibited from considering for exemption any application made to it" if the Secretary of State certifies in writing "within 60 days of any application made under this section" that the exemption and action "would be in violation of an international treaty obligation or other international obligation of the United States." 16 U.S.C. § 1536(i); 50 C.F.R. § 452.03(e). The Secretary of State must publish that certification in the Federal Register. To facilitate this review, the Secretary of the Interior must promptly transmit any application received to the Secretary of State. 50 C.F.R. § 451.02(g).

III.     OUTER CONTINENTAL SHELF LANDS ACT

54.     OCSLA governs the leasing, exploration, and development of oil and gas deposits on the Outer Continental Shelf. 43 U.S.C. § 1331 *et seq.* The Outer Continental Shelf extends from the outer boundary of state waters—typically three miles from shore—to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10605 (Mar 14, 1983).

55.     The Bureau of Ocean Energy Management (BOEM) is the federal agency within the Department of the Interior that manages these activities under OCSLA. 30 C.F.R. § 550.101. The Bureau of Safety and Environmental Enforcement (BSEE), also within the Department of the Interior, is the federal agency responsible for enforcing safety and environmental standards for offshore oil and gas activities and approving some activities. *Id.* § 250.101.

56.     OCSLA prescribes four stages for BOEM to lease and allow development of oil and gas deposits in the Outer Continental Shelf: 1) five-year leasing programs, 2) lease sales, 3) exploration plans, and 4) development and production plans. 43 U.S.C. §§ 1337, 1340, 1344, 1351.

57.     At the five-year program stage, BOEM proposes a schedule of lease sales over an upcoming five-year period. *Id.* § 1344(a).

58.     At the lease sale stage, BOEM offers for sale leases that "entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area," subject to certain additional approvals. *Id.* § 1337.

59.     Lessees must obtain BOEM's approval of an Exploration Plan or Development Operations Coordination Document before they may commence exploration or production, respectively, on a lease in the Gulf. *Id.* §§ 1340, 1351; 30 C.F.R. § 550.201.

60.     Lessees also must obtain approval from BSEE before they may drill or install certain structures. 30 C.F.R. § 550.281.

## IV.     ADMINISTRATIVE PROCEDURE ACT

61.     The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

62.     The APA provides that the reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." *Id.* § 706(2)(A), (C), (D).

## STATEMENT OF FACTS

## I.     THE GULF IS HOME TO THREATENED AND ENDANGERED WILDLIFE.

63.     The Gulf is home to some of the most productive and biodiverse tropical and temperate habitats in the United States, including coral reefs, wetlands, seagrass beds, mangroves, *Sargassum*, and hard- and soft-bottom marine communities. These ecosystems support thousands of species of fish, whales and dolphins, manatees, sea turtles, corals, seabirds,

19

and other animals. Many of the populations found in the Gulf are listed as endangered or threatened under the ESA.

64.    The Rice's whale, sperm whale, blue whale, sei whale, and North Atlantic right whale are found in the Gulf and listed as endangered. The Rice's whale—which is found nowhere else on Earth—is one of the most endangered whales in the world, due primarily to oil and gas activity in its habitat. The West Indian manatee is listed as threatened.

65.    All five sea turtle species found in the Gulf are listed as endangered or threatened: the Kemp's ridley sea turtle (the most endangered sea turtle in the world), hawksbill sea turtle, and leatherback sea turtle are listed as endangered, while the loggerhead sea turtle (Northwest Atlantic Distinct Population Segment [DPS])[3] and green sea turtle (North Atlantic DPS and South Atlantic DPS) populations in the Gulf are listed as threatened.

66.    Among the Gulf's fish species, the oceanic whitetip shark, giant manta ray, Gulf sturgeon, and Nassau grouper are listed as threatened, and the smalltooth sawfish is listed as endangered.

67.    Seven species of coral in the Gulf are listed as threatened: boulder star coral, lobed star coral, mountainous star coral, elkhorn coral, staghorn coral, rough cactus coral, and pillar coral. The queen conch is also listed as threatened.

68.    Four species of birds in the Gulf are listed as endangered: Cape Sable seaside sparrow, Mississippi sandhill crane, whooping crane, and the black capped petrel. Three species are listed as threatened: the piping plover, roseate tern, and rufa red knot.

---

[3] The ESA allows NMFS to separately list individual DPSs of species as threatened or endangered. *See* 16 U.S.C. § 1532(16) (defining "species" to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature"). NMFS identifies DPSs based on the population's "discreteness," "significance," and "conservation status." 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

69.     Four species of beach mice in the Gulf are listed as endangered: Alabama, Choctawhatchee, St. Andrew, and Perdido Key.

70.     Additionally, critical habitat is designated in or along the Gulf for the loggerhead sea turtle, Gulf sturgeon, smalltooth sawfish, Nassau grouper, boulder star coral, lobed star coral, mountainous star coral, pillar coral, rough cactus coral, elkhorn coral, and staghorn coral. NMFS and FWS have proposed designating critical habitat in the Gulf for the Rice's whale, the North Atlantic DPS of the green sea turtle (for nesting), and the rufa red knot.

II.     OIL AND GAS PRODUCTION IN THE GULF HARMS WILDLIFE, THE ECONOMY, AND COMMUNITIES.

71.     Oil and gas production in the United States is at an all-time high. The U.S. is producing more oil than any nation in history and is a top exporter of crude oil. It is also the world's top producer of gas.

72.     With respect to production in the Gulf, the Department of the Interior announced on April 1, 2026, that U.S. production in the Gulf reached record levels in 2025, totaling "over 714 million barrels, the highest annual output on record." The Interior Department reported that "[r]ecent offshore developments and new projects entering production have driven record output levels, particularly in deepwater areas in the Gulf." And "[t]he 2025 total surpasses all previous annual production levels."[4]

73.     Existing federally approved oil and gas exploration, development, and production activities in the Gulf are extensive. Each year, oil and gas operators conduct hundreds of thousands of activities that adversely affect threatened and endangered species and their habitats

---

[4] Dep't of Interior, *Press Release: Interior Highlights Record U.S. Energy Production Under President Trump's American Energy Dominance Agenda* (Apr. 1, 2026), https://www.doi.gov/pressreleases/interior-highlights-record-us-energy-production-under-president-trumps-american.

in the Gulf, including but not limited to, drilling wells, constructing pipelines, installing entire

subsea production systems, pumping oil and gas, and loading and transporting oil, gas, and cargo

on ships. *See* Figure 1.



**Figure 1** – Drilling platforms (orange dots), leases (boxes), and pipelines (red and purple lines) in federal waters in the Gulf as of February 2025 (source: BOEM ARCGIS Visual 1 – Active Leases and Infrastructure online interactive map).

74.     Oil production in the Gulf has remained consistent for more than a decade. Even

with recent incentives from the Trump administration, companies have shown a reluctance to

increase production beyond the existing record levels. The most recent Gulf lease sale was

among the weakest in decades because industry showed little interest.

75.     As of April 2026, there were nearly 2,000 active oil and gas leases across nearly

eleven million acres in the Gulf, supporting approximately 2,000 active oil and gas platforms.

And the industry is sitting on millions of Gulf acres of unused oil-and-gas leases that have not

started producing oil. Nearly 80 percent of active leases in the United States are unused (over 8

million acres).

76.     Effects from these activities on the environment include vessel strikes, noise

(from vessels, seismic surveys, construction, and general operations), oil spills (both large and

small), bottom habitat destruction, and marine debris and other water pollution. Oil and gas activities also degrade air quality, contribute to climate change, erode coastal wetlands, impair commercial and recreational fishing opportunities, harm archaeological resources, and degrade recreational and aesthetic experiences.

77.     The harms from oil and gas activities can become catastrophic, such as when the *Deepwater Horizon* rig exploded and sank on April 20, 2010, killing eleven people and causing the biggest environmental disaster in the history of the Gulf. *See generally In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 21 F. Supp. 3d 657 (E.D. La. 2014).

78.     Scientists estimate the spill caused death or serious harm to billions, if not trillions, of animals, including over 100,000 individuals of species listed as threatened or endangered. The Rice's whale, for example, experienced a twenty-two percent population decline because of the 2010 *Deepwater Horizon* disaster, and it has not and may not ever recover. The spill marred coastal and bottom habitats, causing severe damage to the ecosystems that support the Gulf's biodiversity. The harm from the spill to marine and coastal species and the environment persists to this day.

79.     Despite the lessons of the catastrophic *Deepwater Horizon* disaster, oil and gas operations in the Gulf continue to experience accidents, spill oil, and otherwise cause environmental harm daily. Hundreds of oil and chemical spills in the Gulf are reported to the Coast Guard each year. For example, a 26,000-barrel spill occurred in November 2023 resulting from degradation of the Main Pass Oil Gathering pipeline off the coast of Louisiana, while the Taylor Energy well platform spill has released over three million barrels of oil into the Gulf since the platform was struck by Hurricane Ivan in 2004 and continues leaking to this day. Most recently, in February of this year, a pipeline failure caused tens of thousands of gallons of oil to

leak near Louisiana.

80.    In recent years, drilling activity has been shifting to deeper waters and into high-heat and high-pressure geologic formations, where the risks of well blowouts and catastrophic oil spills are greater.

81.    Oil and gas activities in the Gulf have direct impacts on coastal and environmental justice communities. Refineries and petrochemical plants that rely on oil and gas produced in the Gulf region are more likely to be in low-income and communities of color, and certain communities in Louisiana and Texas have the highest concentration of refineries, petrochemical plants, and other oil and gas infrastructure in the United States. In Louisiana, for instance, an approximately eighty-five-mile stretch along the Mississippi River, from Baton Rouge to New Orleans, has long been known as "Cancer Alley." The area contains more than 200 industrial facilities that release significant amounts of harmful air pollution and is marked by low income levels and high poverty levels. These communities are often overwhelmingly Black: seventy-nine census tracts in Jefferson, St. John the Baptist, East Baton Rouge, and Orleans Parishes are made up of at least ninety percent Black residents. Locals have long experienced health problems including high rates of cancer, respiratory illnesses, and rashes.

82.    The extensive amount of oil and gas activity in the Gulf has also turned portions of it into an oil and gas junkyard. Thousands of wells and hundreds of platforms remain overdue for decommissioning. Decommissioning is the process of permanently plugging oil and gas wells and the clean-up and removal of pipelines, platforms, and other infrastructure used to develop wells. According to a 2024 Government Accountability Office report, seventy-five percent of end-of-lease and idle infrastructure in the Gulf of Mexico was overdue for decommissioning as of 2023, representing over 2,700 wells and 500 platforms. The decommissioning backlog is only

expected to grow.

83.     Due to these effects, federal authorizations of oil and gas activities pursuant to OCSLA are subject to the ESA's section 7 consultation requirements. *Vill. of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984).

III.     THE 2025 NMFS BIOLOGICAL OPINION

84.     On May 20, 2025, NMFS finalized the latest ESA section 7 consultation with BOEM and BSEE regarding oil and gas exploration, development, and production activities in the Gulf in a biological opinion entitled, "Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of America"—the 2025 BiOp.

85.     The 2025 BiOp is a programmatic document that analyzes the effects of oil and gas activities within about 95 million acres of the federal Outer Continental Shelf in the Gulf.

86.      The scope of the 2025 BiOp encompasses the Interior Department's leasing, management, and regulation of oil- and gas-related activities in this area from 2025 through 2029. It includes projections of activities relating to permitting and plan approvals and impacts from all prior active leases and future lease sales. Because leases have about a 40-year lifespan, the "opinion covers approximately 45 years of operations" on those leases. *Id.* at 2.

87.     The range of activities covered in the 2025 BiOp includes geological and geophysical surveys; drilling and production; vessel operations; helicopter operations; offshore infrastructure and construction; construction and operation of pipelines; and decommissioning and structure removal.

88.     NMFS concluded that these activities were likely to adversely affect ESA-listed species including the Rice's whale, sperm whale, Kemp's ridley sea turtle, loggerhead sea turtle (Northwest Atlantic DPS), green sea turtle (North Atlantic DPS), hawksbill sea turtle, leatherback sea turtle, Gulf sturgeon, and queen conch and designated or proposed critical habitat

25

for the Rice's whale, green sea turtle North Atlantic DPS, and Gulf sturgeon.

89.    The Rice's whale stands out among the species adversely affected by these activities. According to NMFS's best estimates, there are fewer than 100 (and as few as 51) Rice's whales left on the planet. These large baleen (filter-feeding) whales spend their entire lives in the Gulf in a band of waters 100m to 400m deep that arcs across the northern Gulf from Florida to Mexico. Rice's whales dive deep for their food and spend a significant amount of time resting at or just below the surface, especially at night. The whale's behavior and limited range make it especially susceptible to disturbance and lethal harm, particularly from strikes by vessels.

90.    In the 2025 BiOp, NMFS concluded that strikes from vessels associated with oil and gas activities would jeopardize the Rice's whale's survival and recovery. NMFS proposed an RPA it believed would compensate for the estimated amount of harm. The RPA consists of set of working groups, studies, monitoring activities, and eventual development of a plan to use technology that may enable vessel operators to detect whales. NMFS asserted that "the proposed action, as revised by this RPA, is not likely to jeopardize the continued existence of the Rice's whale." *Id*. at 584.

## IV.    THE FWS BIOLOGICAL OPINION

91.    On April 20, 2018, FWS issued a Biological Opinion evaluating oil and gas exploration, development, and production activities in the Gulf on the following species: Cape Sable seaside sparrow, Mississippi sandhill crane, piping plover, roseate tern, rufa red knot, whooping crane, and wood stork; nesting Kemp's ridley, loggerhead sea turtles; the Alabama, Choctawhatchee, St. Andrew, and Perdido Key beach mice; and West Indian manatees. FWS concluded that none of these species would be jeopardized by oil and gas activities authorized by BOEM and BSEE. Subsequently, FWS considered the effects of these activities on the recently-

listed black-capped petrel and proposed critical habitat for the rufa red knot and North Atlantic distinct population segment of the green sea turtle and concluded that that these activities were not likely to adversely affect these species or their critical habitat.

V.    THE COMMITTEE'S MARCH 31, 2026, MEETING AND SECRETARY HEGSETH'S MARCH 13, 2026, FINDING

92.    On  March 16, 2026, the Secretary of the Interior published a Federal Register notice announcing that the "Endangered Species Committee" would meet Tuesday, March 31, 2026, "regarding an exemption under the Endangered Species Act with respect to oil and gas exploration, development, and production activities in the Gulf of America associated with the Bureau of Ocean Energy Management and the Bureau of Safety and Environmental Enforcement Outer Continental Shelf Oil and Gas Program." 91 Fed. Reg. 12672 (Mar. 16, 2026). The notice did not state whether a party filed an exemption application nor did it provide any of the information or indications that the steps or conditions necessary to convene the Committee required by the ESA and its implementing regulations had been met.

93.    The notice also did not mention that on March 13, 2026, Secretary Hegseth wrote a letter to Secretary Burgum announcing that he had "found it necessary for reasons of national security to exempt Gulf oil and gas activities from the ESA's requirements," under 16 U.S.C. § 1536(j). Secretary Hegseth requested that Secretary Burgum, acting in his capacity as Chairman of the Endangered Species Committee, convene a meeting of the Committee as soon as practicable to exempt "the agency action that includes these activities." The letter and its attachments were not released or disclosed to the public until after the Committee met and voted on March 31, 2026.

94.    Secretary Hegseth's letter appended a Finding stating the basis for his conclusion that the requested broad exemption is necessary for reasons of national security. The Finding's

27

core justification is the conjecture that ongoing or unspecified future litigation involving the federal government's failures to comply with the ESA might someday result in an immediate and permanent cessation of *all* oil and gas production in the Gulf. After constructing this worst-case future scenario (including conditional responses by numerous third-party actors), the Finding asserts that the Secretary "need not wait to see whether" any of the "risks" will materialize to conclude that an exemption for oil and gas activities in the Gulf was necessary for reasons of national security.

95.     Specifically, the Finding identifies three justifications for its conclusions. First, it asserts that exempting oil and gas activities in the Gulf "would remove the persistent threat of halting oil and gas activities . . . created by litigation challenging agency decisions and actions under the ESA" and the threat that a court may vacate an agency action. Apart from exaggerating or mischaracterizing several court proceedings, the Finding provides no evidence that vacatur or other relief would halt all activities, let alone that this outcome is likely.

96.     Second, it asserts that an exemption would remove the need for agencies to prepare new decisions that correct legal violations found by the courts and instead allow agencies to devote all of their resources to "maximiz[ing] the Gulf's oil and gas production." But the Finding does not provide any evidence showing that court rulings or other judicial remedies have affected agency reviews or project approvals.

97.     Third, the Finding declares that an exemption is necessary "to remove the acute regulatory uncertainty" and "chilling effect" which the Secretary attributes to "existing litigation and threaten[ed] new lawsuits." The Finding does not explain a factual basis for this broad assertion nor how it is attributable solely to ESA compliance.

98.     Importantly, the Defense Secretary's Finding does not identify an existing

irresolvable conflict between implementation of the ESA and pending agency action, as the statute requires for an exemption to be granted. And, in fact, no such conflict exists.

99.     Evidence shows the ESA is not currently constraining current oil and gas exploration and development activities in the Gulf. Indeed, in a lawsuit brought by the State of Louisiana, the American Petroleum Institute, and Chevron, Inc. against the 2025 BiOp, the plaintiffs recently informed a federal district court that they agreed that no relief was necessary to ensure that oil and gas activities could proceed without disruption. *Louisiana v. National Marine Fisheries Service*, Civ. No. 25-cv-00691, (W.D. La. Feb. 19, 2026), ECF No. 58. An exemption from a regulatory framework that industry is already satisfied with will not change the status quo.

100.    The Finding also does not consider an extensive range of alternatives and mitigation measures that protect ESA-listed species and allow robust oil and gas exploration, development, and production to continue; that prices and supplies for crude oil and petroleum products are determined not by domestic production in the Gulf but by often volatile global demand and geopolitical factors; that the U.S. is the world's largest producer, and a net exporter, of oil; that the Administration is elsewhere halting and interfering with renewable energy projects that would otherwise supply alternative sources of energy; and that a blanket exemption from ESA compliance in the Gulf would have catastrophic effects on imperiled wildlife and the millions of people who rely on a healthy Gulf ecosystem.

101.    On March 31, 2026, the Secretaries of Interior, Agriculture, and the Army; the Administrators of the Environmental Protection Agency and the National Oceanic and Atmospheric Administration; and the Chair of the Council on Economic Advisors met and voted to grant an exemption for reasons of national security under Section 7(j). The meeting lasted less

29

than 17 minutes. The officials voted unanimously to grant the Exemption.

102. Shortly after the meeting, the Committee released a written decision purporting to exempt "all oil and gas exploration, development, and production activities associated with" BOEM and BSEE's "Outer Continental Shelf Oil and Gas Program' as described in Secretary Hegseth's Finding." The referenced paragraphs in the Finding describe the "agency action" as "all oil and gas activities in the Gulf of America—encompass[ing] the full suite of agency actions that BOEM and BSEE identified when initiating and pursuing ESA consultation with NMFS." The Exemption does not specify what activities it covers nor for how long. Nevertheless, the Exemption states that "the federal agencies implementing the Gulf of America Oil and Gas Activities are not required to comply with the section 7(a)(2) procedural consultation and substantive 'jeopardy' and 'adverse modification' mandates when they authorize, fund, or carry out covered actions."

103. The Committee's written decision asserts that "the application and other related requirements" in 16 U.S.C. § 1536(h) "do not apply."

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Defendants Burgum, Rollins, Driscoll, Yared, Zeldin, Jacobs Decisions to Grant an Exemption for Offshore Oil and Gas Activities in the Gulf are Contrary to Law and *Ultra Vires* or in Excess of Authority, in Violation of the ESA and APA.**

104. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

105. Under the APA, a reviewing court must set aside a challenged agency action that is "not in accordance with law" "without observance of procedure of procedure required by law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C), (D).

106. Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt*, 338 U.S. 632, 644 (1950)).

107. Recognizing the monumental nature of a decision to allow an activity to cause the extinction of one or more species, the ESA sets forth detailed requirements for the Secretary of the Interior to convene the Committee and for the Committee's consideration of an application for an exemption. 16 U.S.C. § 1536 (e)–(o); 50 C.F.R. §§ 451.02–453.05.

108. The Committee's decision to grant an Exemption disregarded the specific substantive and procedural requirements of the ESA, including requirements that an exemption only be granted after an application is submitted, after the Secretary determines that the application is adequate, and after the Secretary holds an extensive administrative hearing and produces a report, and determines based on that extensive record that the exemption application meets numerous stringent requirements. 16 U.S.C. § 1536(g)–(h).

109. For example, the Committee may only consider an exemption after the expert agency has determined that a proposed federal action is likely to jeopardize the continued existence of species listed under the ESA, and no "reasonable and prudent alternatives" that would avoid jeopardy are available to avoid an irreconcilable conflict between the action and protection of the listed species. 16 U.S.C. § 1536(g); 50 C.F.R. §§ 451.02, 451.03. This fundamental threshold requirement for granting an exemption is absent here.

110. Once it receives an exemption application, the Committee's role goes much further than simply giving it a thumbs up or down. The Committee must, among many other things, solicit, gather, and weigh extensive information to ensure that it has exhausted every

31

possible alternative for allowing an action to proceed *without* risking jeopardy or adverse modification before it makes the extraordinary step of exempting an action from that crucial requirement. 16 U.S.C. § 1536(g)–(h). Even if such alternatives are not available, the Committee must still determine whether the action is so important to the public interest that it would outweigh the existence of one or more species. *Id*. § 1536 (h)(1)(A)(i)–(iv).

111.    Should the Committee grant an exemption, that exemption must contain mitigation enhancement measures that are necessary and appropriate to minimize the adverse effects of the agency action on species and their critical habitat. 16 U.S.C. § 1536(h)(2). These measures must be carried out as part of the implementation of the exempted action. *Id*. § 1536(*l*)(1)–(2).

112.    Defendants Burgum, Rollins, Driscoll, Yared, Zeldin, Jacobs ("the Committee Defendants") issued the Exemption without complying with any of the requirements in Section 7(e)-(o), or the ESA's implementing regulations.

113.    The ESA does not provide the Committee Defendants with the authority to meet and grant an exemption in the absence of these important procedural and substantive safeguards. By skipping the requirements in Sections 7(g) and (h), the Committee Defendants and Interior Secretary Burgum, in his position as Chair of the Committee, acted contrary to the ESA and beyond statutory authority in granting the Exemption.

114.    In addition, the ESA only allows the Committee to grant a national security exemption for an existing "agency action." 16 U.S.C. § 1536(j). Here, the Committee Defendants did not grant an exemption for an existing agency action but instead granted a sweeping Exemption for a broad category of unspecified activities in a large geographic region.

115.    By granting a categorical Exemption to unspecified and in some cases wholly

32

speculative activities, the Committee Defendants and the Secretary of the Interior have abdicated their express mandates to administer the ESA and violated Section 7(g)–(h). 16 U.S.C. § 1536(g), (h).

116.   The Committee's decision to grant a categorical Exemption for all offshore oil and gas activities in the Gulf is "not in accordance with law," "without observance of procedure required by law," and *ultra vires* or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA and the statutory requirements of the ESA. 5 U.S.C. § 706(2).

## SECOND CAUSE OF ACTION

**The Secretary of Defense's Finding that an Exemption is Necessary for National Security is Arbitrary and Capricious and Contrary to the ESA, in Violation of the APA and ESA**

117.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

118.   Even in the limited instances where a national security exception may be invoked under the ESA, the Secretary of Defense must make a written finding that exempting an agency action is "necessary for national security." 16 U.S.C. § 1536(j); 50 C.F.R. § 453.03(d).

119.   The Secretary of Defense, acting in his official capacity as the head of the Department of Defense, is an "agency" under the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

120.   The Defense Secretary's finding that an exemption is necessary for national security constitutes final agency action. *See* 5 U.S.C. § 704; 16 U.S.C. § 1536(h)(1). Specifically, the Secretary's finding "mark[s] the 'consummation' of the agency's decisionmaking process" and is an action "from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Once the Secretary finds that an exemption is necessary for national security reasons, the Committee must grant that exemption. 16 U.S.C. § 1536(j).

121.   The APA requires that a court "hold unlawful and set aside agency action . . . found to be arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

122.   An agency action is arbitrary and capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (citation omitted). An agency cannot "rel[y] on factors which Congress has not intended it to consider, entirely fail[] to consider an important aspect of the problem," or "offer[] an explanation for its decision that runs counter to the evidence before the agency." *Id*.

123.   Agencies must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

124.   The Secretary of Defense made a written Finding on March 13, 2026, that an exemption for oil and gas activities in the Gulf is necessary for reasons of national security and transmitted that finding to the Secretary of the Interior. For the reasons set forth above, there was no lawful basis for the Secretary of Defense to make any findings regarding any exemption or to request consideration by the Committee. Even assuming that a finding was warranted, the Secretary of Defense provided no reasoned basis for his Finding that a categorical exemption for *all* oil and gas activities in the Gulf is necessary for national security. The Secretary of Defense's Finding is based on speculation and irrational assertions about possible future litigation "risk" that are either not supported by or are directly contradicted by the evidence the Secretary purported to rely upon.

125.    The Finding also fails to consider available relevant evidence, including evidence demonstrating that compliance with the ESA is not currently constraining oil and gas activities in the Gulf and that exempting activities from ESA compliance will have no effect on oil and gas supply or demand. The Finding simply fails to draw a rational connection between the available evidence and its conclusions, as mandated by the APA.

126.    The Defense Secretary's Finding is arbitrary, capricious, an abuse of discretion, and not in accordance with Section 7 of the ESA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2)(A).

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.    Declare that the Secretary of Defense's Finding that an exemption is necessary for reasons of national security violates the ESA, its implementing regulations, and the APA;

2.    Declare that the Committee's Exemption violates the ESA, its implementing regulations, and the APA;

3.    Vacate the Secretary of Defense's Finding and the Committee's Exemption;

4.    Grant any injunctive relief necessary to protect ESA-listed species;

5.    Award Plaintiffs their costs and reasonable attorney fees and costs of litigation pursuant to 5 U.S.C. § 552(a)(4)(E) or 28 U.S.C. § 2412; and

6.    Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 2nd day of April, 2026.


*/s/ Stephen D. Mashuda*
Stephen D. Mashuda (DC Bar No. WA0005)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104

35

206-343-7340 Telephone
smashuda@earthjustice.org

Brettny Hardy (*pro hac vice* forthcoming)
Andrea A. Treece (*pro hac vice* forthcoming)
180 Steuart St. #194330
San Francisco, CA 94105
415-217-2000 Telephone
bhardy@earthjustice.org
atreece@earthjustice.org

Ava Ibanez Amador (*pro hac vice* forthcoming)
EARTHJUSTICE
48 Wall St., 15th Floor
New York, NY 10005
212-845-7376 Telephone
alamador@earthjustice.org

*Attorneys for Plaintiffs Healthy Gulf, Friends of the Earth, and Turtle Island Restoration Network*

*/s/ Devorah Ancel*
Devorah Ancel (*pro hac vice* forthcoming)
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
415-845-7847 Telephone
devorah.ancel@sierraclub.org

*Attorney for Plaintiff Sierra Club*

36