**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| HEALTHY GULF, et al.,<br><br>           *Plaintiffs*,<br><br>     v.<br><br>DOUG BURGUM, in his official capacity as<br>SECRETARY OF THE INTERIOR, et al.,<br><br>           *Defendants*. | Case No. 1:26-cv-01118-RC |

**PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS**

**ORAL ARGUMENT REQUESTED[1]**

---

[1] There are two other motions to dismiss pending before the Court raising similar issues in two related cases, No. 26-cv-00940-RC and No. 26-cv-01116-RC. Plaintiffs respectfully request that the Court hear oral argument on or otherwise consider these three motions together.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ..............................................................................................................1

LEGAL BACKGROUND ...................................................................................................2

    I.     Endangered Species Act .........................................................................................2

    II.    The Endangered Species Act Provides Narrow Means for Exempting
        Federal Actions from Section 7(a)(2) Under Exceptional Circumstances...............4

        A.     Application for Exemption ..........................................................................5

        B.     Secretarial Review and Determination .......................................................6

        C.     Committee Review and Decision Under 7(h)..............................................7

        D.     Treatment of Exemption Applications Under Other Subsections...............8

FACTUAL BACKGROUND ..............................................................................................9

    I.     Extensive Gulf Oil and Gas Operations Harm Imperiled Wildlife..........................9

        A.     The 2025 NMFS Biological Opinion.........................................................11

        B.     The FWS Biological Opinion ...................................................................12

    II.    The Committee's March 31, 2026 Meeting and Secretary Hegseth's March
        13, 2026 Finding. .................................................................................................13

STANDARD OF REVIEW ...............................................................................................17

ARGUMENT ....................................................................................................................17

    I.     This Court Has Jurisdiction to Review Conservation Groups' Claims. ................17

        A.     The Challenged National Security Exemption Falls Squarely
                Outside the Scope of Section 7(n). ...........................................................18

        B.     A "decision . . . under subsection (h)" Is Not a Synonym for Any
                Committee Action Involving an Exemption. ............................................25

        C.     Section 7(n) Does Not Preclude APA Review of Decisions Made
                Under Section 7(j)....................................................................................28

        D.     Relief Here Will Not Affect the Circuit Court's Jurisdiction. ...................32

II.    The Court has Jurisdiction to Review Conservation Groups' Claims that the Committee Defendants and Secretary Burgum Acted Ultra Vires/Beyond Their Statutory Authority. ..............................................................36

CONCLUSION.................................................................................................................................37

# TABLE OF AUTHORITIES

**Cases**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Page(s)**

*Adamski v. McHugh*,
　304 F. Supp. 3d 227 (D.D.C. 2015).......................................................................................36

*Allegheny Def. Project v. FERC*,
　964 F.3d 1 (D.C. Cir. 2020).............................................................................................24, 25

*Am. Farm Bureau v. EPA*,
　121 F. Supp. 2d 84 (D.D.C. 2000)........................................................................................34

*Amgen, Inc. v. Smith*,
　357 F.3d 103 (D.C. Cir. 2004).........................................................................................17, 29

*Animal Legal Def. Fund, Inc. v. Vilsack*,
　111 F.4th 1219 (D.C. Cir. 2024)............................................................................................17

*Arch Coal, Inc. v. Acosta*,
　888 F.3d 493 (D.C. Cir. 2018)...............................................................................................32

*Avadel CNS Pharm., LLC v. Becerra*,
　638 F. Supp. 3d 23 (D.D.C. 2022)....................................................................................34, 35

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
　598 U.S. 175 (2023)................................................................................................................17

*Bell v. New Jersey*,
　461 U.S. 773 (1983)................................................................................................................17

*Block v. Cmty. Nutrition Inst.*,
　467 U.S. 340 (1984)..........................................................................................................17, 30

*Bombardier, Inc. v. U.S. Dep't of Lab.*,
　145 F. Supp. 3d 21 (D.D.C. 2015).........................................................................................32

*Ctr. for Biological Diversity v. Burgum*,
　No. 1:24-cv-990-DLF (Aug. 4, 2025)................................................................................13, 29

*Cutler v. Hayes*,
　818 F.2d 879 (D.C. Cir. 1987)...............................................................................................34

*Fischer v. United States*,
　603 U.S. 480 (2024)................................................................................................................26

*Garvey v. Admin. Rev. Bd., U.S. Dep't of Lab.*,
　56 F.4th 110 (D.C. Cir. 2022)................................................................................................27

iv

*Guerrero-Lasprilla v. Barr,*
    589 U.S. 221 (2020)..................................................................................................17, 29

*Khalid v. Blanche,*
    172 F.4th 876 (D.C. Cir. 2026)...............................................................................35

*Kucana v. Holder,*
    558 U.S. 233 (2010)..................................................................................................17

*Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit,*
    507 U.S. 163 (1993)..................................................................................................17

*Maine Cmty. Health Options v. United States,*
    590 U.S. 296 (2020)..................................................................................................25

*McNary v. Haitian Refugee Ctr., Inc.,*
    498 U.S. 479 (1991)..................................................................................................19

*Micei Int'l v. Dep't of Com.,*
    613 F.3d 1147 (D.C. Cir. 2010)...............................................................................17

*Murphy Expl. & Prod. Co. v. U.S. Dep't of the Interior,*
    252 F.3d 473 (D.C. Cir. 2001)...............................................................................24

*Nader v. EPA,*
    859 F.2d 747 (9th Cir. 1988) ...................................................................................34

*Nat. Res. Def. Council, Inc. v. Winter,*
    518 F.3d 658 (9th Cir. 2008) ...................................................................................32

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
    583 U.S. 109 (2018)..................................................................................................19

*Nat'l Trust for Historic Pres. in U.S. v. Nat'l Park Serv.,*
    No. 25-4316 (RJL), 2026 WL 1027744 (D.D.C. Apr. 16, 2026) ...........................28

*NetCoalition v. S.E.C.,*
    715 F.3d 342 (D.C. Cir. 2013)...............................................................................19

*Nielsen v. Preap,*
    586 U.S. 392 (2019)..................................................................................................26

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010,*
    21 F. Supp. 3d 657 (E.D. La. 2014).......................................................................10

* *Portland Audubon Soc'y v. Endangered Species Comm.,*
    984 F.2d 1534 (9th Cir.1993) ...................................................................20, 31, 32

*Prewett v. Weems*,
  749 F.3d 454 (6th Cir. 2014) ..........................................................................24

*Rodriguez v. Penrod*,
  857 F.3d 902 (D.C. Cir. 2017) ........................................................................19

*\*Sea-Land Serv., Inc. v. Fed. Mar. Comm'n*,
  402 F.2d 631 (D.C. Cir. 1968) ........................................................................24

*SI Wireless, LLC v. United States*,
  No. 25-1067, 2026 WL 1358910 (Fed. Cl. May 13, 2026) ...............................33

*Sierra Club v. Nat'l Marine Fisheries Serv.*,
  No. 8:25-cv-01627-DLB (D. Md. filed May 20, 2025) ....................................12

*Telecomms. Rsch. & Action Ctr. v. F.C.C.*,
  750 F.2d 70 (D.C. Cir. 1984) ..........................................................32, 33, 34, 35

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) .......................................................................................2, 4

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) .......................................................................................32, 34

*Vill. of False Pass v. Clark*,
  733 F.2d 605 (9th Cir. 1984) ..........................................................................10

*Watts v. S.E.C.*,
  482 F.3d 501 (D.C. Cir. 2007) ........................................................................18

**Statutes**

5 U.S.C. § 706 ........................................................................................................36

15 U.S.C. § 717r ....................................................................................................24

16 U.S.C. § 825f ....................................................................................................20

16 U.S.C. § 825g ...................................................................................................20

16 U.S.C. § 825l .....................................................................................................20

16 U.S.C. § 1531 ....................................................................................................2

16 U.S.C. § 1532 ...................................................................................................3, 7

16 U.S.C. § 1536 .............................................................................................. *passim*

16 U.S.C. § 1538 ....................................................................................................3

28 U.S.C. § 1331 ................................................................................................................17

Pub. L. No. 95-632, 92 Stat. 3751 (1978) .........................................................................4

**Regulations**

50 C.F.R. § 402.02 .............................................................................................................3

50 C.F.R. § 402.14 ...........................................................................................................3, 4

50 C.F.R. § 451.02 .............................................................................................................6

50 C.F.R. § 451.03 .............................................................................................................5

50 C.F.R. § 452.03 ...........................................................................................................7, 9

50 C.F.R. § 452.04 .............................................................................................................7

50 C.F.R. § 452.05 .............................................................................................................7

50 C.F.R. § 452.06 .............................................................................................................7

50 C.F.R. § 452.08 .............................................................................................................7

50 C.F.R. § 453.03 ............................................................................................................31

**Federal Register**

84 Fed. Reg. 15446 (Apr. 15, 2019) ..................................................................................9

91 Fed. Reg. 12672 (Mar. 16, 2026) ............................................................................13, 15

91 Fed. Reg. 16966 (Apr. 3, 2026) ...................................................................15, 16, 21, 22

**Legislative Material**

S. Rep. No. 97-418 (1982) ..................................................................................................5

*\* Authorities upon which we chiefly rely are marked with an asterisk*

**INTRODUCTION**

On March 31, 2026, Defendants invoked a sweeping interpretation of a never-before-used provision of the Endangered Species Act ("ESA") to execute a hasty end-run around the Act's core requirements. The decision gives the offshore oil industry *carte blanche* to drive some of the nation's most treasured wildlife to extinction as the industry explores for and produces oil and gas in the Gulf of Mexico. Defendants' exemption decision was based on the canard that ESA compliance is incompatible with oil production in the Gulf and the troubling premise that future potential decisions by the judicial branch posed a threat to national security. This unprecedented abuse of the ESA, based on the Secretary of Defense's dangerous and arbitrary interpretation of "national security," departs from both the purpose, plain text, and structure of the ESA.

So too with Defendants'[2] motion to dismiss Conservation Groups' challenge to these actions. That motion is based entirely on the fiction that the Committee issued an exemption under Section 7(h) of the ESA. 16 U.S.C. § 1536(h). But the Secretary of Defense did not seek, and the Committee did not grant, an exemption under that provision. For that fundamental reason, Section 7(n), which provides appellate court jurisdiction *only* for a "decision of the Endangered Species Committee under subsection (h)," does not apply. Moreover, the plain text and structure of the ESA refute Defendants' arguments that all Committee decisions are "(h)" decisions. And the Committee's own actions and statements underscore that the Committee did not complete any of the steps necessary to make a decision in accordance with subsection (h),

---

[2] Conservation Groups refer to all named defendants collectively as "Defendants." As applicable, and consistent with their Amended Complaint, Conservation Groups refer to the six defendants calling themselves the "Endangered Species Committee" as the "Endangered Species Committee" or "Committee" or "Committee Defendants." Conservation Groups do not agree that the "Endangered Species Committee," as provided in the ESA, 16 U.S.C. § 1536(e)–(o), was properly constituted or convened for the exemption challenged in this case.

fatally undermining Defendants' repeated attempts to defeat jurisdiction by labeling its exemption something it was not. Defendants cannot invoke subsection (h) when it suits them and ignore it when it does not.

Defendants' attempt to equate any decision about an exemption with the specific decision reached under subsection (h) contradicts the language and structure of the ESA and the case law governing special review provisions. Contrary to these distractions and contradictions, the ESA is crystal clear—only Committee decisions made under Section 7(h) go to the court of appeals. All other challenges under Section 7 go to the district court. Because an exemption under Section 7(j) is, by the statute's plain terms, not a decision under Section 7(h), Conservation Groups' challenge belongs in the district court. The Court should deny Defendant's motion to dismiss.

## LEGAL BACKGROUND

### I.    Endangered Species Act

Congress enacted the ESA in 1973 in response to the extinction crisis to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174, 180 (1978). The language and history of the Act reflect Congressional intent "to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

The heart of the ESA is Section 7(a)(2), which requires each federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). The ESA and its implementing regulations establish an interagency consultation process to assist

2

federal agencies in complying with this duty. An agency must consult with the appropriate expert wildlife service—either the National Marine Fisheries Service ("NMFS") for marine species or the U.S. Fish and Wildlife Service ("FWS") for terrestrial and freshwater species—under Section 7 whenever it takes an action that "may affect" a threatened or endangered species or critical habitat. *Id.*; 50 C.F.R. § 402.14(a). At the conclusion of formal consultation, NMFS and/or FWS issues a biological opinion assessing the effects of the action and making a formal determination regarding whether the action is likely to jeopardize the continued existence of the species or adversely modify their critical habitats. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h).

If NMFS and/or FWS conclude that the proposed action is likely to jeopardize a listed species or result in adverse modification of its critical habitat, it must propose reasonable and prudent alternatives ("RPAs"), if available, that will mitigate the proposed action to avoid jeopardy and adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3); 50 C.F.R. §§ 402.02, 402.14(h)(2). RPAs must: 1) be capable of being implemented in a manner consistent with the intended purpose of the action, 2) be within the scope and authority of the agency's jurisdiction, 3) be economically and technologically feasible, and 4) avoid the likelihood of jeopardizing the continued existence of the species. 50 C.F.R. § 402.02.

The ESA also protects individual members of a listed species by prohibiting "take" of endangered species by any person, which includes federal agencies. 16 U.S.C. § 1538(a)(1). "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." *Id.* § 1532(19). If NMFS and/or FWS concludes in a biological opinion that the proposed action (or an RPA) will not jeopardize the continued existence of a listed species or adversely modify its critical habitat, but will incidentally take members of a listed species, it must include with the biological opinion an "incidental take statement" that specifies the amount of take that may occur

3

without causing jeopardy or adverse modification of critical habitat, as well as the measures required to limit take. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

For more than 50 years, the ESA consultation process has assisted federal agencies in carrying out their activities in a manner that avoids pushing species to extinction and ensuring appropriate mitigation measures that limit harms to listed species. The overwhelming majority of those consultations have concluded that an agency action can either proceed without causing jeopardy or can proceed so long as the federal agency implements one or more RPAs that alter the project in ways that sufficiently avoid or mitigate the harm. Head-to-head conflicts—where an action cannot proceed and there are no measures that would avoid jeopardizing the species— are exceptionally rare. Am. Compl. ¶ 40, ECF No. 19.

## II.    The Endangered Species Act Provides Narrow Means for Exempting Federal Actions from Section 7(a)(2) Under Exceptional Circumstances.

Congress amended Section 7 in 1978 in response to one of these exceptionally rare circumstances. In *Tennessee Valley Authority,* the Supreme Court halted construction of the partially completed Tellico Dam after holding that the federal project violated the ESA by causing the extinction of a fish species. 437 U.S. at 173–74, 193–95. In response, Congress installed a relief valve in Section 7, allowing agencies and others to apply for an exemption from Section 7(a)(2) requirements for an action in very narrow circumstances. Pub. L. No. 95-632, § 1, 92 Stat. 3751 (1978); 16 U.S.C § 1536(e)–(o).

These amendments established the "Endangered Species Committee" and charged it with the responsibility to consider exemption applications. The amendments prescribed a detailed, mandatory process for entities to submit applications for exemptions, and for the Committee to consider and make determinations whether to grant them. Under the ESA, the Committee is led by the Secretary of the Interior and composed of six other officials: the Secretaries of Agriculture

4

and the Army, the Chairman of the Council of Economic Advisers, the Administrators of the

Environmental Protection Agency and the National Oceanic and Atmospheric Administration,

and a person appointed by the President from the state affected by an application for an

exemption. 16 U.S.C. § 1536(e)(3), (g)(2)(B); 50 C.F.R. § 451.03(b). When no State is affected,

the Interior Secretary shall ask the President to appoint an individual with expertise relevant to

the application. 50 C.F.R. § 451.03(b)(2).

Section 7 prescribes rigorous requirements for granting an exemption, which are designed

to ensure that exemptions will only be granted in situations involving a truly "irresolvable

conflict" where a vital federal agency could not proceed without jeopardizing a species (i.e., that

there were no alternatives). S. Rep. No. 97-418, at 17 (1982). Recognizing the gravity of any

decision to exempt an action from the ESA's core requirements, Section 7 accordingly imposes a

rigorous default process that includes numerous conditions for an applicant to first apply for an

exemption and for the Secretary and Committee to review the application and determine whether

and with what conditions to grant it. The Committee can grant a permanent exemption for an

activity only after compliance with these steps and substantive requirements.

In addition, Section 7 provides for limited circumstances where decisions about the fate

of an exemption application are made outside of these detailed steps. Those include a provision

requiring summary denial of an exemption application where the action would violate an

international treaty, and provisions to grant more limited exemptions where doing so may be

necessary to address specified, urgent situations. The steps and sideboards involved in this

carefully constructed statutory scheme are described below.

### A.    Application for Exemption

In order to secure an exemption from Section 7(a)(2), a Federal agency, the governor of a

state in which an agency action will occur, or a permit or license applicant must first apply for

that exemption in writing. 16 U.S.C. § 1536(g)(1); 50 C.F.R. § 451.02(c). Notably, Section 7(g)(1) specifies that an applicant may apply if, after consultation, the biological opinion indicates that "the agency action would violate subsection [7](a)(2)." 16 U.S.C. § 1536(g)(1). The written application must include "a description of the consultation process carried out pursuant to subsection (a)(2)" and "a statement describing why such action cannot be altered or modified to conform with the requirements of subsection (a)(2)." 16 U.S.C. § 1536(f). The statute makes clear that the Committee has no jurisdiction to act, let alone proceed to a decision under subsection (h) without first being presented with a valid application for an exemption. *See Id.* § 1536(g)(1) ("An application for an exemption shall be considered initially by the Secretary in the manner provided for in this subsection, and shall be considered by the Committee for a final determination under subsection (h) after a report is made pursuant to paragraph (5)."). Without an application, the relevant Secretary has nothing to consider, no need to develop a report, and the Committee has nothing to decide.

### B.    Secretarial Review and Determination

After receiving an application submitted under Section 7(g), the relevant Secretary must promptly publish notice of the application in the Federal Register, 50 C.F.R. § 451.02(h), and then must make a threshold determination to confirm that, among other things, the applicant has: (1) completed the consultation process in good faith, including efforts to develop and "fairly consider" reasonable and prudent alternatives that would not violate Section 7(a)(2); and (2) refrained from making any irreversible or irretrievable commitments of resources that might foreclose alternatives in violation of Section 7(d), 16 U.S.C. § 1536(d), (g)(3)(A). If the applicant has not met all of these requirements, the Secretary "shall" deny the application. *Id.* § 1536(g)(3)(B). A denial decision is subject to judicial review in the district court.

If the relevant Secretary makes a positive threshold determination, the Secretary must begin to gather information necessary to prepare a report for the Committee within 140 days. 50 C.F.R. §§ 452.03–.04, 452.08(b). To collect that relevant information, the Secretary must hold a hearing before an Administrative Law Judge pursuant to sections 554, 555, and 556 of the Administrative Procedure Act ("APA"), *id*. § 452.05, including the opportunity for participation from the parties and from intervenors, *id*. § 452.06; 16 U.S.C. § 1536(g)(4).

After the close of the hearing, the relevant Secretary must prepare a report on the application discussing: (1) any reasonable and prudent alternatives to the proposed action and the benefits of all alternatives (including those not limited to the original project purposes or by agency jurisdiction) as compared to the proposed action; (2) a summary of evidence regarding whether the proposed action serves the public interest and is of national or regional significance; (3) mitigation and enhancement measures that should be considered by the Committee; and (4) whether any irreversible or irretrievable commitments of resources occurred in violation of ESA Section 7(d). 16 U.S.C. §§ 1532(1), 1536(g)(4)–(5).

## C.      Committee Review and Decision Under 7(h)

Committee decisions under Section 7(h) are made following this exhaustive review process and include several required elements. In particular, the Committee may grant an application for an exemption only if, by vote of at least five of its seven members, it determines that four specific factors have been met based on the Secretary's report, the hearing record, and other testimony or evidence: (1) there are no reasonable and prudent alternatives; (2) the benefits of the proposed action "clearly outweigh" the benefits of alternatives (again, not limited to the original project purpose or the agency's jurisdiction) and serve the public interest; (3) the proposed action is of regional or national significance; and (4) neither the applicant nor the action agency has made any irreversible or irretrievable commitments of resources in violation of

7

ESA Section 7(d). *Id.* § 1536(h)(1)(A). In granting an application for an exemption, the Committee must also establish "reasonable mitigation and enhancement measures, including, but not limited to, live propagation, transplantation, and habitat acquisition and improvement, as are necessary and appropriate to minimize the adverse effects of the agency action upon the endangered species, threatened species, or critical habitat concerned." *Id.* § 1536(h)(1)(B). An exemption issued after this evaluation is permanent barring certain exceptions. *Id.* § 1536(h)(2)(B).

Section 7 contains a judicial review provision that only applies to Committee decisions made under Section 7(h). Section 7(n) specifies that "any decision of the Endangered Species Committee *under subsection (h)*" is subject to judicial review in the appropriate Court of Appeals. 16 U.S.C. § 1536(n) (emphasis added).

### D. Treatment of Exemption Applications Under Other Subsections

Section 7 provides for two unusual, narrow circumstances in which an exemption may be granted through a means other than a Committee decision under subsection (h). One is outlined in Section 7(p), which provides that in a Presidentially declared "major disaster area . . . the President is authorized to make the determinations required by subsections (g) and (h) of this section" in "an emergency situation which does not allow the ordinary procedures of this section to be followed" and requires that "the Committee shall accept the determinations of the President." *Id*. § 1536(p).

The other is Section 7(j), which states that "the Committee shall grant an exemption for any agency action if the Secretary of Defense finds that such exemption is necessary for reasons of national security." *Id.* § 1536(j). Whereas other provisions in Section 7 expressly refer to exemptions "under," "in accordance with" or "pursuant to" subsection (h), Section 7(j) makes no

8

mention of subsection (h). *Compare e.g.*, *id. with* 16 U.S.C. §§ 1536(e)(2); (*l*)(1), (o)(1). It simply directs the Committee to "grant an exemption." *Id*. § 1536(j).

Section 7 also provides for a specific circumstance prohibiting the Committee from even considering an exemption application. Under Section 7(i), the Committee cannot consider an application if the Secretary of State, after review of the proposed action, certifies in writing that granting the exemption for the action "would be in violation of an international treaty obligation or other international obligation of the United States." *Id.* § 1536(i); 50 C.F.R. § 452.03(e).

## FACTUAL BACKGROUND

**I.    <u>Extensive Gulf Oil and Gas Operations Harm Imperiled Wildlife.</u>**

The Gulf is home to dozens of species listed as threatened or endangered under the ESA, including whales, sea turtles, fish, corals, birds, and beach mice. NMFS, *ESA Section 7 Biological and Conference Opinion* 132–238 (May 20, 2025) ("2025 BiOp")[3]; Am. Compl. ¶¶ 65–71. NMFS has identified offshore oil and gas activities as one of the primary threats to the survival and recovery of several species, particularly the Rice's whale, considered the most endangered large marine mammal on the planet, numbering less than 100 individuals and exclusively inhabiting Gulf of Mexico waters. *See* 84 Fed. Reg. 15446 (Apr. 15, 2019). NMFS estimates that as few as 51 Rice's whales remain on the planet. Am. Compl. ¶ 90.

Gulf wildlife must swim through a gauntlet of deafening, polluting, and dangerous oil and gas operations pervading most of the Gulf as they attempt to feed, reproduce, and survive. Each year, oil and gas operators conduct hundreds of thousands of activities that adversely affect threatened and endangered species and their habitats in the Gulf, including drilling wells, constructing pipelines, installing entire subsea production systems, pumping oil and gas, and

---

[3] The 2025 BiOp is available at https://www.fisheries.noaa.gov/resource/document/biological-and-conference-opinion-bureau-ocean-energy-management-and-bureau (visited July 14, 2026).

loading and transporting oil, gas, and cargo on ships. Am. Compl. ¶ 74. As of July 2026, there were nearly 2,000 active oil and gas leases across nearly eleven million acres in the Gulf, supporting approximately 2,000 active oil and gas platforms. Bureau of Ocean Energy Management ("BOEM"), *Combined Leasing Report* (July 1, 2026), https://www.boem.gov/oil-gas-energy/leasing/lease-stats-7-1-26; Am. Compl. ¶ 76.

Effects from these activities on the environment include vessel strikes, noise (from vessels, seismic surveys, construction, and general operations), oil spills (both large and small), bottom habitat destruction, and marine debris and other water pollution. Am. Compl. ¶ 77. Oil and gas service vessels travel tens of millions of kilometers per year, making up about half the total vessel traffic in the Gulf. 2025 BiOp 344. Rice's whales are particularly susceptible to being struck by vessels because they are slow-moving and tend to rest just below the surface, especially at night when vessels cannot see them. 2025 BiOp 347–48.

The harms from oil and gas activities can become catastrophic, such as when the *Deepwater Horizon* rig exploded and sank on April 20, 2010, killing eleven people and causing the biggest environmental disaster in the history of the Gulf. *See generally In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 21 F. Supp. 3d 657 (E.D. La. 2014). Less acute but nonetheless severe harms occur on an ongoing basis. Oil and gas operations in the Gulf continue to experience accidents, spill oil, and otherwise cause environmental harm daily. Hundreds of oil and chemical spills in the Gulf are reported to the Coast Guard each year. Am. Compl. ¶ 80.

Because they have such far-reaching effects on listed species and their critical habitats, federal authorizations of oil and gas activities are subject to the ESA's section 7 consultation requirements. *Vill. of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984).

10

A.      **The 2025 NMFS Biological Opinion**

On May 20, 2025, NMFS finalized the latest ESA section 7 consultation with BOEM and Bureau of Safety and Environmental Enforcement ("BSEE") regarding oil and gas exploration, development, and production activities in the Gulf in a biological opinion entitled, "Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of America"— the 2025 BiOp. Am. Compl. ¶ 85. The 2025 BiOp is a programmatic document that analyzes the effects of oil and gas activities within about 95 million acres of the federal Outer Continental Shelf in the Gulf, encompassing the Interior Department's leasing, management, and regulation of oil- and gas-related activities in this area from 2025 through 2029. Am. Compl. ¶¶ 86–87. The range of activities covered in the 2025 BiOp includes geological and geophysical surveys, drilling and production, vessel operations, helicopter operations, offshore infrastructure and construction, construction and operation of pipelines, and decommissioning and structure removal. Am. Compl. ¶ 88.

NMFS concluded that these activities were likely to adversely affect ESA-listed species including the Rice's whale, sperm whale, Kemp's ridley sea turtle, loggerhead sea turtle (Northwest Atlantic DPS), green sea turtle (North Atlantic DPS), hawksbill sea turtle, leatherback sea turtle, Gulf sturgeon, and queen conch and designated or proposed critical habitat for the Rice's whale, green sea turtle North Atlantic DPS, and Gulf sturgeon. Am. Compl. ¶ 89. The Rice's whale stands out among the species adversely affected by these activities. According to NMFS's best estimates, there are fewer than 100 (and as few as 51) Rice's whales left on the planet. Am. Compl. ¶ 90. These large baleen (filter-feeding) whales spend their entire lives in the Gulf in a band of waters 100m to 400m deep that arcs across the northern Gulf from Florida to Mexico. Am. Compl. ¶ 90. Rice's whales dive deep for their food and spend a significant amount of time resting at or just below the surface, especially at night. Am. Compl. ¶ 90. The whale's

11

behavior and limited range make it especially susceptible to disturbance and lethal harm, particularly from strikes by vessels. Am. Compl. ¶ 90.

In the 2025 BiOp, NMFS concluded that strikes from vessels associated with oil and gas activities would jeopardize the Rice's whale's survival and recovery. NMFS proposed an RPA it believed would compensate for the estimated amount of harm. The RPA consists of a set of working groups, studies, monitoring activities, and eventual development of a plan to use technology that may enable vessel operators to detect whales. Am. Compl. ¶ 91. NMFS asserted that "the proposed action, as revised by this RPA, is not likely to jeopardize the continued existence of the Rice's whale." 2025 BiOp 584.

Several parties, including some of the plaintiffs here, challenged the 2025 BiOp in federal district court in Maryland, asserting, among other things, that NMFS had underestimated the magnitude, frequency, and harm caused by oil spills and vastly underestimated the harm from vessel strikes, seismic airgun surveys, and other activities on sea turtles and the critically endangered Rice's whale. *Sierra Club v. Nat'l Marine Fisheries Serv.*, No. 8:25-cv-01627-DLB (D. Md. filed May 20, 2025).

### B.    The FWS Biological Opinion

On April 20, 2018, FWS issued a Biological Opinion evaluating oil and gas exploration, development, and production activities in the Gulf on the following species: Cape Sable seaside sparrow, Mississippi sandhill crane, piping plover, roseate tern, rufa red knot, whooping crane, and wood stork; nesting Kemp's ridley, loggerhead sea turtles; the Alabama, Choctawhatchee, St. Andrew, and Perdido Key beach mice; and West Indian manatees. Am. Compl. ¶ 92. FWS concluded that none of these species would be jeopardized by oil and gas activities authorized by BOEM and BSEE. Am. Compl. ¶ 92. Subsequently, FWS considered the effects of these activities on the recently-listed black-capped petrel and proposed critical habitat for the rufa red

knot and North Atlantic DPS of the green sea turtle and concluded that that these activities were not likely to adversely affect these species or their critical habitat. Am. Compl. ¶ 92.

The Center for Biological Diversity challenged the FWS Biological Opinion in this district. Am. Compl., *Ctr. for Biological Diversity v. Burgum*, No. 1:24-cv-990-DLF (D.D.C. Aug. 4, 2025), ECF No. 36.

## II.    The Committee's March 31, 2026 Meeting and Secretary Hegseth's March 13, 2026 Finding.

On January 26, 2026, the Department of the Interior notified the Department of Defense of its view that ongoing ESA litigation, primarily the cases against the NMFS and FWS biological opinions, allegedly "threatens to halt oil and gas production" in the Gulf. Declaration of Stephen D. Mashuda, Ex. 1 (Letter from Pete Hegseth, Sec'y of War, to Doug Burgum, Sec'y of Interior, Request for ESA Exemption for Gulf of America Oil and Gas Activities 1 (Mar. 13, 2026) ("Hegseth Letter") and attached Memorandum for Record from Pete Hegseth, Sec'y of War on National Security Findings (Mar. 13, 2026) ("Finding")). On March 13, 2026, Secretary Hegseth wrote a letter to Secretary Burgum announcing that he had "found it necessary for reasons of national security to exempt Gulf oil and gas activities from the ESA's requirements," under 16 U.S.C. § 1536(j). Hegseth Letter 1; 91 Fed. Reg. 12672 (Mar. 16, 2026) (Endangered Species Committee Meeting Notice). Secretary Hegseth's letter appended a Finding stating the basis for his conclusion that the requested broad exemption was necessary for reasons of national security.

The Defense Secretary's Finding does not identify an existing irresolvable conflict between implementation of the ESA and pending agency action, nor does it identify an application submitted pursuant to Section 7(g)(1), as the statute requires to even begin consideration of an exemption under subsection (h). 16 U.S.C. § 1536(g)(1). Rather, Secretary

13

Hegseth's core justification for the requested exemption was that, if a court were to hold that a biological opinion governing the Gulf oil and gas program violates the law, that court could vacate that unlawful biological opinion, which Secretary Hegseth mistakenly believed would immediately and permanently halt all oil and gas activities in the Gulf. *See* Finding ¶¶ 8–10, 42–46. He concluded such vacatur is "a significant threat to national security." *Id.* ¶¶ 93, 95. The Finding provides no evidence that vacatur or other relief would halt all activities, let alone that this outcome is likely.

Secretary Hegseth also asserted that even judicial remedies short of vacatur would somehow pose a "risk to national security" by diverting agency resources to complying with the law rather than devoting all of their resources to "maximiz[ing] the Gulf's oil and gas production." *Id.* ¶¶ 96–97. Secretary Hegseth posited that even the mere existence of litigation seeking to compel compliance with the ESA threatened to create "regulatory uncertainty" that might have a "chilling effect" on industry interest. *Id.* ¶¶ 81–82. Based on this conjecture and worst-case scenario (including conditional responses by numerous third-party actors), Secretary Hegseth announced that he "d[id] not need to wait to see whether" any of these "risks" will materialize to conclude that an exemption for oil and gas activities in the Gulf was necessary for reasons of national security. *Id.* ¶ 93. The Secretary's Finding provided no rational basis for any of the scenarios it purportedly seeks to address with an exemption and failed to address multiple lines of evidence demonstrating that there is no conflict between measures necessary to protect species under the ESA and oil production in the Gulf, nor any of the evidence that oil supply, price, and production are driven by global processes and factors far outside the Gulf. Nonetheless, Secretary Hegseth requested that Secretary Burgum, acting in his capacity as Chairman of the Endangered Species Committee, convene a meeting of the Committee as soon

14

as practicable to exempt "the agency action that includes these [oil and gas] activities." Hegseth Letter 1.

On March 16, 2026, the Secretary of the Interior published a Federal Register notice announcing that the "Endangered Species Committee" would meet Tuesday, March 31, 2026, "regarding an exemption under the Endangered Species Act with respect to oil and gas exploration, development, and production activities in the Gulf of America associated with the Bureau of Ocean Energy Management and the Bureau of Safety and Environmental Enforcement Outer Continental Shelf Oil and Gas Program." 91 Fed. Reg. at 12672.

On March 31, 2026, the Secretaries of Interior, Agriculture, and the Army; the Administrators of the Environmental Protection Agency and the National Oceanic and Atmospheric Administration; and the Chair of the Council on Economic Advisors met and voted unanimously to grant an exemption for reasons of national security under Section 7(j). 91 Fed. Reg. 16966 (Apr. 3, 2026). The meeting did not consider or discuss elements required for a decision under Section 7(h). For example, the Committee did not receive or discuss a factual report from the Secretary, 16 U.S.C. § 1536(g)(5), (h)(1)(A), nor was there even an application upon which such a report would be based. The Committee did not make any determinations about whether the four necessary factors under Section 7(h) had been met or establish mitigation and enhancement measures, as required under that subsection. 16 U.S.C. § 1536(h)(1)(A), (B).

Several hours after the meeting concluded, the Committee released a written order purporting to exempt "all oil and gas exploration, development, and production activities associated with" BOEM and BSEE's "Outer Continental Shelf Oil and Gas Program" as described in Secretary Hegseth's Finding. Endangered Species Committee Order 1 (Mar. 31, 2026) ("Order"), published at 91 Fed. Reg. at 16966. The referenced paragraphs in the Finding

15

describe the "agency action" as "all oil and gas activities in the Gulf of America—encompass[ing] the full suite of agency actions that BOEM and BSEE identified when initiating and pursuing ESA consultation with NMFS." Finding ¶ 90. The Order does not specify what activities it covers nor for how long. Nevertheless, the exemption states that "the federal agencies implementing the Gulf of America Oil and Gas Activities are not required to comply with the section 7(a)(2) procedural consultation and substantive 'jeopardy' and 'adverse modification' mandates when they authorize, fund, or carry out covered agency actions." 91 Fed. Reg. at 16966.

While (repeatedly) asserting that the exemption was granted under Section 7(h), the Committee's Order states that it does not contain mitigation and enhancement measures required as part of an exemption made under Section 7(h) because "the application and other related requirements" that are inherently part of a 7(h) decision "do not apply." *Id*. In other words, the Committee did not complete any of the steps or include any of the elements that are required for it to make a decision under Section 7(h).

Conservation Groups promptly filed this case on April 2, 2026, ECF No. 1, and amended the complaint as of right on May 26, 2026, ECF No. 19. Conservation Groups plead three claims: (1) that the Committee Defendants violated the ESA and the APA by issuing the exemption without complying with any of the specific substantive and procedural requirements in 16 U.S.C. § 1536 (e)–(o), or the ESA's implementing regulations, ECF No. 19, ¶¶ 106–117; (2) that Secretary Hegseth's national security Finding violates the ESA and the APA, *id*. ¶¶ 119–127; and (3) that Secretary Burgum's actions and inactions, in his role as chair of the Committee, exceeded his statutory authority, in violation of the ESA and APA, *id*. ¶¶ 129–132.

**STANDARD OF REVIEW**

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, a court must accept as true all the factual allegations in the complaint. *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993); *Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1227 (D.C. Cir. 2024) (finding that on review of dismissal for "subject matter jurisdiction," courts "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged" (cleaned up)).

**ARGUMENT**

**I.      This Court Has Jurisdiction to Review Conservation Groups' Claims.**

There is a "presumption favoring judicial review of administrative action." *Kucana v. Holder*, 558 U.S. 233, 251 (2010). This presumption is "well-settled" and "strong." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (citation omitted). And the presumption can only be overcome by "'clear and convincing evidence' that Congress intended to preclude the suit." *Amgen, Inc. v. Smith*, 357 F.3d 103, 111 (D.C. Cir. 2004) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967)); *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984) (explaining that "where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling").

Because district courts have "original jurisdiction" over "all civil actions arising under" federal law, 28 U.S.C. § 1331, the default rule is that persons seeking review of a federal agency action must first go to the district court rather than to a court of appeals. *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023). In the absence of a specific provision providing appellate court jurisdiction, the normal default rule applies. *Micei Int'l v. Dep't of Com.*, 613 F.3d 1147, 1151 (D.C. Cir. 2010); *see Bell v. New Jersey*, 461 U.S. 773, 777 n.3 (1983) ("The

17

presumption that review is available, coupled with the absence of any indication in the statute that the decision is committed wholly to the discretion of the agency or that review is otherwise precluded, leads to the conclusion that the district courts would have had jurisdiction under the general grant of jurisdiction over cases involving federal questions." (citations omitted)). Here, there is no indication in the ESA that the circuit courts have jurisdiction to review a decision made under Section 7(j), so the default rule applies.

Contrary to Defendants' insistence that every action involving an exemption in subsections 7(e)–(p) is somehow always a "decision of the Endangered Species Committee under subsection (h)," *see* ECF No. 25-1, at 8, that can only be reviewed in the courts of appeals, even a casual examination of the statute demonstrates otherwise. Properly understood in the context of the carefully prescribed exemption process, Section 7(n) assigns only one specific type of exemption decision to appellate court review: Committee decisions under subsection (h). The Court should reject Defendants' invitation to read into subsection 7(n) a sweeping mandate for appellate court review of *any and all* actions and decisions under the Act's exemption provisions.

### A. The Challenged National Security Exemption Falls Squarely Outside the Scope of Section 7(n).

Defendants attempt to circumvent the default rule of district court jurisdiction by claiming that Section 7(n), rather than federal question jurisdiction, governs review of the challenged exemption. ECF No. 25-1, at 8–9. This assertion is directly at odds with the plain language and structure of the statute. Agency actions cannot be challenged in the first instance in a court of appeals unless "a direct-review statute *specifically* gives the court of appeals subject-matter jurisdiction to directly review" that action. *Watts v. S.E.C.*, 482 F.3d 501, 505 (D.C. Cir. 2007) (emphasis added). And "[a]n appellate court's jurisdiction under a direct review statute is

18

strictly limited to the agency action(s) included therein." *NetCoalition v. S.E.C.*, 715 F.3d 342, 348 (D.C. Cir. 2013); *see also Rodriguez v. Penrod*, 857 F.3d 902, 906 (D.C. Cir. 2017) (holding that a statute must *expressly* direct review to the circuit court of appeals to avoid the default rule). Section 7 of the ESA neither suggests nor provides in any explicit terms circuit court jurisdiction for the decision challenged in this case.

Instead, the plain language of Section 7(n) "strictly limit[s]," *NetCoalition*, 715 F.3d at 348, jurisdiction in the courts of appeals to only "decision[s] of the Endangered Species Committee" that are made "*under subsection (h)*," 16 U.S.C. § 1536(n) (emphasis added); *see McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492–94 (1991) (holding that Congress' choice of limited statutory language limits the scope of a direct review provision). When interpreting a similar phrase in a different direct review provision, the Supreme Court determined that the phrase "under [a certain section]" "is most naturally read to mean" that the decision must be made "'pursuant to' or 'by reason of the authority of'" the referenced subsection. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 110–111 (2018) (citation omitted). Under that natural reading, the national security exemption at issue here does not fall within Section 7(n) because the decision was not made pursuant to authority that is found in subsection (h). 16 U.S.C. § 1536(j). The decision the Committee makes pursuant to the authority of subsection (h) is "a final determination whether or not to grant an exemption" *only after* it is presented with a valid application and after it considers and makes a determination on the record that the application meets four specific factors (based on a report and a record from an administrative hearing, and

19

other evidence produced in compliance with subsection (g)) and *only if* the Committee establishes reasonable mitigation and enhancement measures. 16 U.S.C.§ 1536(h)(1),[4] (g)(1).

It makes sense that Section 7(n) limits circuit court review of Committee decisions to those made under subsection (h), because those decisions are made based on a record developed through a predicate adjudicatory process in subsection (g). *See Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1540–41 (9th Cir.1993) (finding that "the Committee decides whether to grant or deny specific requests for exemptions based upon specific factual showings. Thus, the Committee's determinations are quasi-judicial . . . [and] constitute 'adjudications' within the meaning of § 554(a)."). Indeed, other statutes assign original jurisdiction to appellate courts based on a similar presumption that there has been a full and fair opportunity for input from all parties and the development of a full factual and legal record. For example, the Federal Power Act assigns "exclusive" jurisdiction to the circuit courts after the Federal Power Commission conducts a full factual investigation and hearing that includes witnesses and a record. 16 U.S.C. § 825l(b); *see also id*. §§ 825f, 825g. Here, the Committee's order was not based on any such fully developed factual showings or any quasi-judicial proceedings that would allow the Committee to "function as an *administrative court of last resort.*" *Portland Audubon Soc'y*., 984 F.2d at 1541 (quoting S. Rep. No. 97-418, at 17 (1982).

---

[4] In full, subsection (h) states that the Committee "shall grant an exemption . . . if . . . it determines on the record, based on the report of the Secretary, the record of the hearing held under subsection (g)(4) and on such other testimony or evidence as it may receive, that—

    **(i)**      there are no reasonable and prudent alternatives to the agency action;

    **(ii)**     the benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such action is in the public interest;

    **(iii)**    the action is of regional or national significance; and

    **(iv)**    neither the Federal agency concerned nor the exemption applicant made any irreversible or irretrievable commitment of resources prohibited by subsection (d)."

Beyond the express language of the statute, it is beyond dispute that the Committee did not engage in any deliberation of "whether or not to grant" an exemption here, let alone consider or weigh the statutory factors or recommend mitigation—it was not even presented with a valid application, the essential prerequisite for it to take any action. *See* 16 U.S.C. § 1536(g)(1) ("An application for an exemption . . . shall be considered by the Committee for a final determination under subsection (h)"). Rather, the Committee specifically confirmed that it did not engage with any of the requirements of subsection (h); succinctly stating its view that its only role under subsection (j) was to reflexively grant the Defense Secretary's demand for an exemption. 91 Fed. Reg. at 16966. ("When the Secretary of [Defense] makes such a finding, the statute and regulations require the Committee to grant an exemption . . . ."). The meeting held by the Committee to vote confirms that it exercised no independent judgment or decision-making. In a meeting that lasted approximately 17 minutes, the Committee Defendants each issued perfunctory statements affirming that they lacked authority to disapprove Secretary Hegseth's request before unanimously "voting" to approve it. *See, e.g.*, Mashuda Decl. Ex. 2 (Committee Hearing Transcript ("Transcript") 10); *id.* at 11 (Statement of Sec. of the Army Driscoll, "Although this Committee has no discretion to oppose this exemption, I fully support it as a necessary measure."); *id.* at 12 (Statement of Acting Chair of Economic Council Yared, "I have been advised that as a legal matter, the Committee is required to grant an exemption when a national security finding is made."); *id.* at 13 (Statement of NOAA Administrator Jacobs, "The statutory provision for national security exemption requires the Committee to grant an exemption if the Secretary of War finds it necessary for national security reasons.").

The Committee drove this home by explicitly disavowing the need to comply with any of the provisions of (h) and recognized that it was acting outside the bounds of the process that

21

leads to a decision under subsection (h). As the Committee noted, subsection (*l*)(1) requires that in granting an exemption "under subsection (h)," the Committee "shall . . . specify[] the mitigation and enhancement measures established pursuant to subsection (h) which shall be carried out" by the exemption applicant. *See* 91 Fed. Reg. at 16966 (citing 16 U.S.C. § 1536(*l*)(1)). In other words, subsection (*l*) presumes a thorough examination of the evidence and a set of findings that identified those mitigation measures that only occurs through the requirements of subsection (g) and (h). But the Committee then disclaimed that it was required to provide mitigation under subsection (*l*), reasoning that the mitigation requirements in (*l*)—which specifically depend on findings made under (h)—do not apply to this exemption under subsection (j). As the Committee summarized it:

> The Order need not specify any such mitigation and enhancement measures here *because the application and other related requirements do not apply.* The mitigation-and-enhancement requirement *contemplates an application and an "exemption applicant," which are not present in this situation* where the Secretary of War determines that an exemption is necessary for reasons of national security.

91 Fed. Reg. at 16966 (emphases added).

This remarkable admission is worth unpacking. Defendants contend that the provisions of (*l*), which are predicated upon the findings required by (h), do not apply *precisely because* there was no consideration or findings made under subsection (h). In other words, when it comes to mitigation, Defendants tout that the Committee did not make a decision under subsection (h). But when it comes to jurisdiction, Defendants now take the complete opposite position and contend that they did make a decision under subsection (h) for the sole purpose of fitting it into Section 7(n). Defendants cannot invoke subsection (h) when it suits them and ignore it when it does not. This is not just about inconsistency; it highlights that even Defendants believe that they made a decision under subsection (j), not subsection (h), in this case.

22

That the Committee ultimately played a limited role in issuing the exemption demanded by the Secretary of Defense does not transmogrify that issuance into a Committee "decision . . . under subsection (h)." Without compliance with the requirements of subsection (h), the challenged exemption was simply not "a decision . . . under subsection (h)." 16 U.S.C. § 1536(n). An example helps to illustrate this point. Conservation Groups will argue on the merits that subsection (j) can be invoked, at a minimum, only after the Secretary receives and completes a review of a valid application under subsection (g). In that instance, subsection (j) would prevent the Committee from making a decision under subsection (h) by elevating the Secretary's national security concerns over anything the Committee would otherwise consider in deciding whether to grant an exemption. Defendants have already taken the position that subsection (j) can be invoked even without an application and without awaiting any consideration. But the Court need not resolve or prejudge the merits of the parties' positions to conclude that it has jurisdiction to consider them because the jurisdictional upshot of both parties' arguments is the same. In either reading, there is never a Committee decision under subsection (h)—and thus, no appellate court jurisdiction under subsection (n).

This Court should reject Defendants' attempts to read into Section 7(n) language and purpose that simply are not there. Section 7(n) does not address national security findings made by the Secretary of Defense under Section 7(j); nor does it provide any suggestion that it applies to subsequent Committee responses to that 7(j) finding. Rather, Section 7(n) is expressly limited to Committee decisions made under Section 7(h); its language simply does not support Defendants' sweeping interpretation. In contrast to Section 7(n), other statutes provide explicit jurisdiction to courts of appeals over "any" agency action or decision. For example, the Natural Gas Act (NGA) provides certain courts of appeals with exclusive jurisdiction to review "any"

23

Federal Energy Regulatory Commission decision "to issue, condition, or deny any permit, license, concurrence, or approval . . . required under Federal law" for certain natural gas facilities. 15 U.S.C. § 717r(d)(1). If Congress meant to broadly steer review of every action the Committee takes in the exemption process to the circuit courts, it could have done what it did in the NGA. It could have written 7(n) without the "under subsection (h)" limitation, or by making it more broadly applicable to "any exemption." It chose not to do so. *Prewett v. Weems*, 749 F.3d 454, 461 (6th Cir. 2014) ("Omitting a phrase from one statute that Congress has used in another statute with a similar purpose 'virtually commands the . . . inference' that the two have different meanings." (citation omitted)).

Finally, the fact that the Committee (repeatedly) labeled the exemption order at issue here as a decision made under subsection (h) has no bearing here. *See* ECF No. 25-1, at 11–12. The Committee cannot defeat the actual nature of its action by affixing a different label to it. *Sea-Land Serv., Inc. v. Fed. Mar. Comm'n*, 402 F.2d 631, 633 (D.C. Cir. 1968) (stating that an agency's "label is not conclusive, and what is decisive is the substance of what it has done"). Both the Supreme Court and the D.C. Circuit have determined that "agencies get no deference in interpreting jurisdictional" statutory provisions. *Allegheny Def. Project v. FERC*, 964 F.3d 1, 18 (D.C. Cir. 2020) (citing *Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 649–650 (1990)); *Murphy Expl. & Prod. Co. v. U.S. Dep't of the Interior*, 252 F.3d 473, 478–479 (D.C. Cir. 2001). That is because "deference is available only when an agency interprets a statutory provision that Congress has charged it with administering through application of its expertise" and "[f]ederal agencies do not administer and have no relevant expertise in enforcing the boundaries of the

courts' jurisdiction." *Allegheny*, 964 F.3d at 11 (citing *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1088 (D.C. Cir. 2019).[5]

**B.      A "decision . . . under subsection (h)" Is Not a Synonym for Any Committee Action Involving an Exemption.**

Contrary to Defendants' arguments, the phrase "under subsection (h)" is not a synonym for every action the Committee takes under the exemption provisions in subsections (e)–(p). ECF No. 25-1, at 11. Rather, that phrase appears in specific instances throughout the provisions governing the Committee's exemption process as part of a comprehensive scheme that meaningfully differentiates the kinds of decisions that are reviewed in the district court and those that go to the appellate court. As Defendants note, Congress did reference exemptions made "under" or "pursuant to" or "in accordance with" subsection (h) in some provisions of Section 7. *Id*. (citing 16 U.S.C. § 1536(a)(2), (e)(2), (h)(1), (*l*), (m), (o)(1)). But this cuts against the argument they advance here because this phrase is conspicuously absent from other provisions, *see, e.g.*, *id.* § 1536(e)(3)(G), (i), (j), (k)—most prominently from subsection (j)—making clear that Congress did not view every decision or action related to an exemption as one made "under subsection (h)." "[W]hen Congress includes particular language in one section of a statute but omits it in another, Congress intended a difference in meaning." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 314 (2020) (cleaned up). Indeed, under either Conservation Groups' or Defendants' reading of the ESA, the Committee did not make a decision under Section 7(h), making Section 7(n) inapplicable to this challenge. *See supra* p. 23.

Defendants' attempt to equate all references to an "exemption" with "a decision under subsection (h)" impermissibly renders these distinctions meaningless and turns the repeated

---

[5] As discussed *supra* p. 22, Defendants' selective invocation of 7(h) only when it suits them underscores that their repeated labeling is mere show, not substance.

specific references to (h) into surplusage. Such a reading violates the basic canon that "every word and every provision is to be given effect [and that n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012), quoted in *Nielsen v. Preap*, 586 U.S. 392, 414 (2019); *see also Fischer v. United States*, 603 U.S. 480, 498 (2024) (rejecting an interpretation that "renders an unnerving amount of statutory text mere surplusage"). If Congress meant for Section 7(n) to assign review for *all exemption decisions* to the appellate courts, it would have written Section 7(n) to say "any decision . . . regarding an exemption under this section." Similarly, if Congress meant for all exemptions to be treated the same, it would have no need to call out exemptions "under 7(h)" specifically in these other provisions. Congress did neither of these things.

More particularly, if Congress had meant a national security exemption under Section 7(j) to be an exemption "pursuant to" or "under" subsection (h), it would have said so. Instead, Congress's choice of specific language underscores that an exemption pursuant to 7(j) is different in kind. Section 7(j) does not reference subsection (h) at all—it authorizes "an exemption" more generally. 16 U.S.C. § 1536(j). Like (j), other parts of Section 7 reference an exemption more generally. *See, e.g.*, *id.* § 1536(e)(3)(G), (i), (k). For example, subsection (k), which excuses exemption decisions from compliance with the National Environmental Policy Act, also refers more capaciously to "*An exemption* decision by the Committee under this section," not an exemption under subsection (h). 16 U.S.C. § 1536(k) (emphasis added). If Congress thought there was only one kind of exemption decision (one issued under subsection (h)), it would have simply repeated the phrase referring to that subsection in all places; just as it did in Sections 7(a)(2), 7(n), and 7(o). The contrast is intentional and meaningful. When

"Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Garvey v. Admin. Rev. Bd., U.S. Dep't of Lab.*, 56 F.4th 110, 124 (D.C. Cir. 2022) (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)). Put simply, Congress did not state an exemption under subsection (j) is granted "under" or "pursuant to" subsection (h) and this Court should not read that phrase into the statute *sub silentio*.

That certain provisions of Section 7 only reference exemptions granted under Section 7(h) makes sense. For example, with respect to Sections 7(a)(2) and 7(o), waiving the Act's core prohibitions on "jeopardy" and "take" of species has existential consequences for imperiled wildlife. That is precisely why the permanent exemption under subsection (h) is reached only after demonstration of a truly irreconcilable conflict and only after extensive fact-finding, consideration of alternatives including the identification of mitigation measures, and a careful balancing of the public interest in preserving species against the importance of an action. 16 U.S.C. § 1536(g)–(h). By contrast, an exemption granted under subsection (j) does not automatically or permanently relieve an agency of all its obligations under subsection (a)(2) or the take limitations imposed under subsection (b)(4). The extent of an exemption from these obligations will depend on what exactly is "necessary" for national security. *See* 16 U.S.C. § 1536(j). For example, the Secretary of Defense could find that a project must move forward despite jeopardizing the continuing existence of one species, but that a full exemption for every affected species is not necessary. The scope and details of any exemption would also be informed by the intensive review and fact-finding process that occurred under Section 7(g), ensuring that both the Secretary of Defense and the Committee would have the benefit of information about alternatives and mitigation that are key parts of any report. 16 U.S.C. §

27

1536(g)(4)–(8). Similarly, given the shifting nature of national security threats, a national

security exemption could be necessary only for so long as the time it takes to resolve a particular

threat, rather than exempting an action permanently.

Nor is Secretary Hegseth's national security Finding a "predicate" to a decision under

subsection (h), as Defendants claim (ECF. No. 25-1, at 12).[6] As discussed above, the authority

under the two subsections is entirely distinct. *See supra* pp. 20–23. Likewise, Defendants are

wrong to suggest that Conservation Groups seek to challenge "procedural," "preliminary," or

"intermediate" actions that "culminate" in a Section 7(h) decision. ECF No. 25-1, at 14–15.

Rather, Conservation Groups' claims address whether the Committee must still follow the

procedures in Section 7(g) and Section 7(h) *before* the Secretary of Defense can force the

Committee to grant a national security exemption under Section 7(j). As explained above, those

claims are about an action that *culminates in a Section 7(j) decision*, not a Section 7(h) decision.

Whether the Secretary of Defense can force the Committee's hand before an application is

submitted or before the Committee follows the procedures in 7(g) or before the Committee

considers or even before the Committee denies an exemption application under 7(h) are

questions to be resolved as part of the merits.

### C.    Section 7(n) Does Not Preclude APA Review of Decisions Made Under Section 7(j).

Defendants claim that granting or denial of an exemption under subsection (h) is "the

---

[6] It is unclear what Defendants mean by their passing assertion that the Secretary of Defense's national security finding "is not even reviewable." ECF No. 25-1, at 16. Many courts, including in this district, have concluded just the opposite. *See, e.g.*, *Nat'l Trust for Historic Pres. in U.S. v. Nat'l Park Serv.*, No. 25-4316 (RJL), 2026 WL 1027744, at *4 n.2 (D.D.C. Apr. 16, 2026) (noting that while courts may grant deference to certain national security findings, "judicial deference is not the same as withholding judicial review altogether" and collecting examples, including several recent cases from this district, where courts review national security justifications for legitimacy).

only event" that can trigger judicial review, and that Section 7(n) is the "single avenue for judicial review." ECF No. 25-1, at 8, 10. But this argument that Section 7(n) precludes review of *all* Section 7 exemption actions under the APA in the district court, *id*. at 18–20, is contrary both to the presumption favoring judicial review of all agency action and to the ESA's statutory structure and purpose.

First, subsection (n) does not contain language that expressly precludes judicial review of *all* actions taken under the exemption provisions of Section 7; it only directs challenges to specific Committee decisions made under subsection (h) to the courts of appeals. And Defendants do not otherwise provide "clear and convincing evidence" to overcome the *strong* presumption that Congress intends review of other actions. *See Guerrero-Lasprilla*, 589 U.S. at 222–23 (2020); *Amgen*, 357 F.3d at 111 (citation omitted). While there is express language that Congress intended to preclude district court APA review when the Committee holds a hearing, prepares a record, and makes a decision under subsection (h), Section 7(n) does not preclude review when the Committee makes other decisions under Section 7's exemption provisions.

Indeed, the statute directly contradicts that assertion. Section 7(g)(3) requires the Secretary, within 20 days of receiving an application for an exemption, to determine whether the application satisfies several threshold criteria for consideration. The denial of an exemption application for failure to meet these criteria is, as Defendants have elsewhere admitted, reviewable in district court. *See Ctr. for Biological Diversity*, No. 26-cv-00940-RC, ECF No. 30, at 11. So, Defendants have since abandoned the assertion in their motion that Section 7(n) is the "single avenue to judicial review." ECF No. 25-1, at 10. This recent admission further undercuts Defendants' argument that Section 7(n) contains an "exclusive" judicial review provision that covers *all* decisions related to an exemption. ECF No. 25-1, at 13 (citing *Telecomms. Rsch. &*

*Action Ctr. v. F.C.C.* ("*TRAC*"), 750 F.2d 70, 77 (D.C. Cir. 1984)). Of course, Section 7(n) does not use the word "exclusive" or otherwise explicitly provide exclusive jurisdiction to the courts of appeal "in all cases covered by [the exemption provisions]." Where compliance with *some* Section 7 exemption provisions are admittedly reviewed in the district court, a provision directing other decisions to the circuit courts cannot, by definition, be "exclusive." To the extent that Defendants characterize subsection (g)(3) denials as eligible for district court review because the denial precludes the possibility that an application would proceed to a decision under subsection (h), that is a distinction without a difference. As explained above, the national security exemption under subsection (j) in this case has the same effect as an application denial under (g)(3): it either precludes the Committee from making a decision under subsection (h) or trumps the Committee's decision to deny the application under (h).[7] Just like a denial under subsection (g)(3), the subsection (j) exemption is a final agency action that may be challenged in the district court.

Second, Section 7's exemption provisions contain three other subsections that allow for decisions apart from subsection (h) and which are not mentioned in the judicial review provision. *Block*, 467 U.S. at 345 ("Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme . . . ."). Apart from Section 7(g)(3) denials, the exemption provisions allow for decisions under subsections (p), (i), and, as is most relevant here, under subsection (j). Subsection (p) grants the President, and not the Committee, authority to effectively grant or deny exemptions in Presidentially-declared major disaster areas if the President determines that an

---

[7] And, of course, in this case, there was no application for an exemption—the essential trigger for proceeding to a decision under (h), 16 U.S.C. §§ 1536(e)(2), (g)(1)—which also precludes the possibility of any Committee decision under that subsection.

action is necessary to prevent the recurrence of a natural disaster and must be done in a time frame that does not allow for the "ordinary" exemption procedures to be followed. 16 U.S.C. § 1536(p)(1)–(2). Likewise, subsection (i) allows the Secretary of State to prohibit the Committee from considering an exemption application once the Secretary certifies in writing that the granting of an exemption would violate international treaty. *Id*. § 1536(i). Finally, Section 7(j) gives the Secretary of Defense authority to force the Committee to grant an exemption when the Secretary determines in writing it is necessary for reasons of national security. *Id*. § 1536(j); 50 C.F.R. § 453.03(d).

These decisions under (p), (i), and (j) are not made by the Committee under subsections (g) and (h). The Committee is, in fact, not effectively *deciding* anything. Instead, other entities are either making an operative decision for the Committee (the President in (p)), preventing the Committee from making a decision at all (the Secretary of State in (i)), or forcing a decision on the Committee (the Secretary of Defense in (j)). All of those decisions, whether they are rubber-stamped by the Committee or not, fall outside the narrow scope of Section 7(n)'s judicial review. Nor could these decisions be made pursuant to subsection (h) because they either preclude the Committee from exercising authority to do what that provision ultimately requires—to weigh the required factors, make the required findings, or direct mitigation measures—or override any decision the Committee might have made under subsection (h).

Indeed, other courts have differentiated these subsections as different sources of authority than subsection (h). For example, in one of the few challenges to an exemption granted under subsection (h), the Ninth Circuit noted that subsections (p), (i), and (j) are "three instances the [ESA] provides that the Committee *does not* have the final word on an exemption application." *Portland Audubon Soc'y.*, 984 F.2d at 1545 n.24. The Ninth Circuit went on to explain that "the

31

Secretary of Defense [has] the *ultimate say* over exemption applications . . . where the grant of an exemption is necessary for national security reasons" and that the Secretary of Defense has "the authority" to "*decide the issue for the Committee*" under Section 7(j). *Id.* (emphases added); *see also Nat. Res. Def. Council, Inc. v. Winter*, 518 F.3d 658, 684 n.45 (9th Cir. 2008), *rev'd on other grounds*, 555 U.S. 7 (2008) (characterizing an exemption under Section 7(j) as unique and interpreting exemption under Section 7(j) as "granted if the Secretary of Defense finds such exemption necessary").

### D.    Relief Here Will Not Affect the Circuit Court's Jurisdiction.

Defendants cite to *TRAC* and its progeny to suggest that ultimately granting relief in this case might "affect the Circuit Court's future jurisdiction." ECF No. 25-1, at 14–17. That is not true. Because Section 7(n) is very limited in scope, this case does not fit into the *TRAC* framework.

As an initial matter, Defendants' citations to *Arch Coal* and *Bombardier* are misplaced. ECF No. 25-1, at 13 (citing *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 498 (D.C. Cir. 2018) and *Bombardier, Inc. v. U.S. Dep't of Lab.*, 145 F. Supp. 3d 21, 31 (D.D.C. 2015)). Both of those cases applied the *Thunder Basin* framework because the action concerned enforcement proceedings and a special review scheme that provides for "multiple opportunities for administrative appeal before judicial review is possible." *See Bombardier*, 145 F. Supp.3d at 31–32 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 202, 207–16 (1994)); *see also Arch Coal*, 888 F.3d at 500). The judicial review provision at issue here does not concern enforcement proceedings and does not allow for any opportunities for administrative appeal. The *Thunder Basin* factors and the cases that rely on that analysis are not relevant.

This case also does not fit under the *TRAC* rubric. In *TRAC*, the judicial review provision at issue provided for review of *all final orders* of the Federal Communications Commission

(FCC) under the Federal Trade Act. 750 F.2d at 75. The D.C. Circuit evaluated whether the circuit court had jurisdiction to review a claim under the All Writs Act that the FCC had unlawfully delayed agency action by withholding a final order. *Id*. at 76. The court determined that because the D.C. Circuit would eventually consider the merits of the same final order the case sought to compel, it played an important role in compelling the agency to act. *Id*. Otherwise, agencies could defeat the circuit court's jurisdiction to review their final orders by simply failing to reach a decision. *Id*. As another court recently summarized, the *TRAC* "rule applies to cases concerning interlocutory challenges to agency proceedings that will culminate in final agency actions exclusively reviewable by certain courts. In those cases, the court with jurisdiction over the final agency action also has exclusive jurisdiction over the interlocutory challenges in order to 'protect its future jurisdiction.'" *SI Wireless, LLC v. United States*, No. 25-1067, 2026 WL 1358910, at *5 (Fed. Cl. May 13, 2026) (citation omitted).

That reasoning does not apply here. First, Conservation Groups' claims here are not seeking to compel a subsequent decision or challenging a step in a decision-making process. There is no other shoe to drop. Defendants have made the ultimate and final decision—this Court will decide whether to set that decision aside or uphold it. Unlike *TRAC*, this Court's decision will have no effect on if, how, or when the circuit court would consider anything related to this decision in the future.

A ruling addressing the legality of the national security exemption applied here would not affect the circuit courts' jurisdiction to review a *future* decision that the Committee may make under subsection (h)—after, for example, finding an application sufficient and collecting and considering evidence under subsection (g), and weighing the factors and making the findings required in subsection (h). Nor would it lead to piecemeal or inconsistent review. Any future

33

decision would be a new final agency action based on its own new scientific and administrative record. But just because a ruling in this case might indirectly lead to an eventual case in a circuit court *after* this illegal decision is set aside and *if* the Defendants then chose a different path on remand, does not mean it in any way affects the circuit court's jurisdiction to review *this* exemption. This Court's ruling would be final as to this exemption; it would not then factor into or cause the circuit court to consider this exemption.

Second, as explained above, Section 7(n) does not direct review to the circuit court for *all* Committee decisions, but only those taken under subsection (h). The D.C. Circuit has "made clear" that "essential to [the] holding [in *TRAC*] were statutory provisions enabling [the court] to review *any* final FCC order." *Avadel CNS Pharm., LLC v. Becerra*, 638 F. Supp. 3d 23, 31 (D.D.C. 2022) (citing *Cutler v. Hayes*, 818 F.2d 879, 887 n.61 (D.C. Cir. 1987)); *see also Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 93 (D.D.C. 2000); *Nader v. EPA*, 859 F.2d 747, 751 (9th Cir. 1988). Rather than setting up a "special statutory review scheme," like those evaluated under the *Thunder Basin* factors, as Defendants try to paint Section 7(n) to be, Section 7(n) is more akin to a "specialized review provision[]," like the one the courts evaluated in *Avadel* and *Cutler*. *Avadel*, 638 F. Supp. 3d at 31. The D.C. Circuit has determined specialized review provisions, like Section 7(n) "should be construed 'narrowly.'" *Id*. (citing *Cutler*, 818 F.2d at 887 n.61) "Agency action taken under sections silent" about review "are directly reviewable in a district court . . . for courts of appeals have only such jurisdiction as Congress has chosen to confer upon them." *Cutler*, 818 F.2d at 887 n.61. Just like in those cases, the district court has jurisdiction because the claims here do not involve a challenge to a Committee decision under subsection (h), as explained above. Thus, even if this Court were to rule in favor of Conservation Groups and vacate the national security exemption, the circuit courts' jurisdiction under Section

34

7(n) to review any separate future decision to exempt activities under subsection (h) "remains intact." *Avadel*, 638 F. Supp. 3d at 31.

Extending Section 7(n)'s grant of jurisdiction to the national security exemption here "would go far beyond *TRAC*'s holding." *Khalid v. Blanche*, 172 F.4th 876, 887 (D.C. Cir. 2026). As the D.C. Circuit recently emphasized, "*TRAC* does not suggest our exclusive jurisdiction extends to an agency or to an action other than those set forth in the applicable statutory provision." *Id*. Like in *Khalid*, "the exclusivity of [the circuit court's] jurisdiction begins and ends" with subsection (h). *Id*. Challenges to decisions made under subsection (j) "fall outside the class of claims that Section [7(n)] covers." *Id*. Consequently, the circuit court cannot exercise jurisdiction over any final agency action here and so a decision by the district court will not affect that jurisdiction.

Nor would a decision here create the inconsistencies that Defendants imagine. ECF No. 25-1, at 16. First, as explained *supra*, a decision under subsection (j) is not a preliminary decision on the road to an eventual decision under subsection (h) and Conservation Groups are not bringing an interlocutory challenge to a subsection (h) decision. Instead, a decision under subsection (j) is different in kind from a decision under subsection (h). A decision under subsection (j) is not intertwined with a decision under subsection (h). According to Defendants, a decision under subsection (j) would either preclude or trump any decisions under subsection (h), not the other way around. This can be illustrated by considering an example where the Committee denied an exemption under subsection (h) based on an evaluation of the four required factors. Only a circuit court would have the jurisdiction to review that denial and review the Committee's evaluation of the four factors. But if the Secretary of Defense subsequently determined that the denied exemption was necessary for national security under subsection (j),

35

the Committee's forced granting of the exemption would moot its previous denial under subsection (h). As a result, that subsequent decision would not fall under Section 7(n) but instead would go to the district court under the default federal question jurisdiction.

Moreover, the potential for inconsistent results in Defendants' hypothetical—where one party challenges the Secretary of Defense's national security finding in the district court, while another challenges the Committee's order in the court of appeals—suffers from a flawed premise. As detailed throughout this brief, challenges to both the Secretary's national defense finding and the Committee's order granting an exemption based on it are proper only in the district court as neither of them is a Committee "decision . . . under subsection (h)" that trigger Section 7(n). 16 U.S.C. § 1536(n).

**II.      The Court has Jurisdiction to Review Conservation Groups' Claims that the Committee Defendants and Secretary Burgum Acted Ultra Vires/Beyond Their Statutory Authority.**

For the same reasons articulated above, the Court also has jurisdiction to review whether the Committee Defendants and Secretary Burgum's actions and inactions were in excess of statutory authority. Contrary to Defendant's characterizations, these claims do not seek to plead around APA review; they are properly seeking review in this Court under Section 706(2)(C) of the APA. 5 U.S.C. § 706(2)(C). As courts often note, claims brought under this subsection are often described as ultra vires. *E.g.*, *Adamski v. McHugh*, 304 F. Supp. 3d 227, 236 (D.D.C. 2015) ("the phrase 'ultra vires' is often used to describe certain claims that have been brought under provisions of the APA. Specifically, when a plaintiff contends that a particular agency action is 'not in accordance with law' under 5 U.S.C. § 706(2)(A) or 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right' under 5 U.S.C. § 706(2)(C), courts sometimes characterize these statutorily-based assertions as 'ultra vires' claims." (collecting

36

cases)). And just like Conservation Groups' other APA challenges, as detailed above, Defendants' violations of this section of the APA are also reviewable in the district court.

## CONCLUSION

Defendants' decision to short-circuit the ESA's meticulously crafted requirements to elevate Gulf oil production over the survival of the Gulf's sea turtles, Rice's whales, manatees, seabirds, and sharks and rays, is without precedent. Defendants' attempts to escape this Court's scrutiny by cloaking themselves in the narrow jurisdictional provision of Section 7(n) are meritless. They find no support in the ESA's plain text and statutory structure or case law. The exemption challenged in this case is simply not a decision made "under subsection (h)" and thus Section 7(n)'s jurisdictional constriction does not apply. For all of the reasons detailed above, the Court should deny Defendant's motion to dismiss and proceed to the merits of Conservation Groups' challenge.


Respectfully submitted this 14th day of July, 2026.


*/s/ Stephen D. Mashuda*
Stephen D. Mashuda (DC Bar No. WA0005)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
smashuda@earthjustice.org

Brettny Hardy (*pro hac vice*)
Andrea A. Treece (*pro hac vice*)
180 Steuart St. #194330
San Francisco, CA 94105
415-217-2000 Telephone
bhardy@earthjustice.org
atreece@earthjustice.org

Ava Ibanez Amador (*pro hac vice*)
EARTHJUSTICE

37

48 Wall St., 15th Floor
New York, NY 10005
212-845-7376 Telephone
alamador@earthjustice.org

*Attorneys for Plaintiffs Healthy Gulf, Friends of the Earth, Turtle Island Restoration Network, and Oceana*

/s/ Devorah Ancel
Devorah Ancel (*pro hac vice*)
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
415-845-7847 Telephone
devorah.ancel@sierraclub.org

*Attorney for Plaintiff Sierra Club*

38