# EXHIBIT 1

CUI



**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR 1 3 2026

The Honorable Doug Burgum
Secretary of Interior
Washington, DC  20240

Dear Mr. Secretary:

On January 26, 2026, the Department of the Interior notified the Department of War of ongoing Endangered Species Act (ESA) litigation that threatens to halt oil and gas production in the Gulf of America.  This would have disastrous consequences for our national security.  Separately, ESA litigation threatens national security by preventing the agencies that regulate oil and gas activities from realizing the Gulf's full developmental potential — it diverts their resources away from approving permits and hampers the agencies' discretion, which typically leads to more restrictive operations.  The ESA litigation also creates uncertainty and instability that is beginning to chill oil and gas development in the Gulf.  I have thus found it necessary for reasons of national security to exempt Gulf oil and gas activities from the ESA's requirements and therefore write to request that the Endangered Species Committee (ESC) grant an exemption for the agency action that includes these activities.

The ESA bans the "taking" (e.g., harassing or harming) of ESA-protected species unless it is done in compliance with an applicable exemption or permit issued by either the U.S. Fish and Wildlife Service (FWS) or the National Marine Fisheries Service (NMFS).  The ESA, 16 U.S.C. § 1536(a)(2), also requires each Federal agency to ensure that its actions are not likely to "jeopardize" the continued existence of endangered or threatened species or destroy or adversely modify the designated critical habitat of such species "unless such agency has been granted an exemption" by the ESC.

Congress prudently created such an exemption to protect the national security, thereby balancing the need to preserve and protect our Nation's biodiversity and resources with the overwhelming imperative to safeguard the homeland and the American people.  Pursuant to 16 U.S.C. § 1536(j), the ESC "shall grant an exemption for any agency action if the Secretary of [War] finds that such exemption is necessary for reasons of national security."

After reviewing information from subject-matter experts and consulting with Department of War staff, I have found that it is necessary for reasons of national security to exempt from the ESA's requirements the proposed action reviewed in NMFS's 2025 biological opinion and in FWS's 2018 and 2025 consultation decisions, which covers all oil and gas exploration and development activities associated with the Department of the Interior Bureau of Ocean Energy Management and Bureau of Safety and Environmental Enforcement's Outer Continental Shelf Oil and Gas Program.  At the same time, protected species will continue receiving appropriate protections because the underlying agency action includes those mitigation and protection measures that the relevant agencies identified as necessary when developing the proposed action

CUI

that is the subject of this determination.  I have enclosed my finding to this letter.  In short, acting now to exempt this action is necessary to remove a substantial threat to national security.

Pursuant to 16 U.S.C. § 1536(j), I request that, in your capacity as Chairman, you convene a meeting of the ESC as soon as practicable to grant, pursuant to section 7(h) of the ESA, this exemption to safeguard and protect the national security.

Enclosure:
As stated

cc:
The Honorable Brooke Rollins
    Secretary, U.S. Department of Agriculture
The Honorable Daniel Driscoll
    Secretary, U.S. Department of the Army
Pierre Yared
    Acting Chairman, Council of Economic Advisors
The Honorable Lee Zeldin
    Administrator, U.S. Environmental Protection Agency
The Honorable Neil Jacobs
    Undersecretary of Commerce for Oceans and Atmosphere and Administrator, National
    Oceanic and Atmospheric Administration

2

CUI

# ATTACHMENT

CUI



**SECRETARY OF WAR**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAR 1 3 2026

MEMORANDUM FOR RECORD

SUBJECT:  National Security Findings

In accordance with Section 1536(j) of title 16, United States Code, and for the reasons explained herein, I hereby find that it is necessary for reasons for national security to exempt from the Endangered Species Act (ESA) the proposed action reviewed in the National Marine Fisheries Service (NMFS) 2025 biological opinion and the Fish and Wildlife Service (FWS) 2018 and 2025 consultation decisions, which covers all oil and gas exploration and development activities associated with the Department of the Interior Bureau of Ocean Energy Management (BOEM) and Bureau of Safety and Environmental Enforcement's (BSEE) Outer Continental Shelf Oil and Gas Program.

Summary

1.    The Gulf of America's outer continental shelf is one of the world's major oil and gas producing regions.  It produces 15% of U.S. crude oil (roughly two million barrels per day) and about 1.7% of U.S. dry natural gas, making it essential to domestic energy operations.[1]

2.    Application of the ESA and recent litigation over its application threaten oil and gas development throughout the Gulf's outer continental shelf.

3.    The ESA requires each Federal agency to ensure that its actions are not likely to "jeopardize" the continued existence of endangered or threatened species or destroy or adversely modify the designated critical habitat thereof.  16 U.S.C. § 1536(a)(2).  This includes the two agencies that regulate oil and gas activities in the Gulf: BOEM and BSEE.

4.    To comply with the ESA, these agencies consult with subject-matter agencies: NMFS and FWS.  *See id.* § 1536(a).  Formal consultation culminates in a biological opinion, which details how the agency action is likely to affect the species or its critical habitat, and an incidental take statement, which sets out terms and conditions that agencies and regulated parties must follow when implementing the action. Any "taking" (e.g., harassing or harming) of any ESA-protected species done in compliance with the terms and conditions of an incidental take statement is lawful under the ESA.

5.    There are current biological opinions and incidental take statements that govern all oil and gas activities in the Gulf's outer continental shelf.  The ESA consultation decisions are critically important for oil and gas activities in the Gulf because they protect agencies and regulated parties from civil and criminal liability when conducting these activities.

---

[1] *See* BOEM, Oil & Gas – Gulf of America; U.S. Energy Information Administration, Petroleum & Other Liquids. Per the Department of Energy, the Gulf "exports generate a surplus sufficient to power over half of all U.S. households annually." *See* DOE, *Gulf of America Energy Security* at 1.

Controlled by:  DoW OGC
CUI Category:  PRIVILEGE
Limited Dissemination Control:  AW; AC
POC:  Brian Nicholson, (703) 614-6714

CUI

6. These biological opinions and incidental take statements have repeatedly been challenged in litigation over the last several years and are being challenged in multiple cases at this time.

7. This litigation, which relies on alleged ESA violations, creates a substantial risk that the applicable biological opinions and incidental take statements will be vacated.

8. Vacatur, in turn, would halt oil and gas exploration and development throughout the Gulf's outer continental shelf. It would immediately prevent BOEM and BSEE from issuing any new approvals for oil and gas activities in the Gulf, and it would call into question all existing approvals.

9. Vacatur also would threaten the safety and integrity of critical infrastructure throughout the Gulf. BSEE, for example, would be unable to ensure timely approvals for actions needed to repair hazardous well conditions and pipelines.

10. The biological opinion and incidental take statement that preceded the current consultation decisions were subject to an order of vacatur by a district court, and oil and gas development would have ceased but for a stay that the district court voluntarily imposed and then extended. *See Sierra Club v. NMFS*, 797 F. Supp. 3d 440, 496 (D. Md. 2024).

11. Regardless of vacatur, the ESA litigation is diverting federal resources away from approving, managing, and regulating oil and gas activities in the Gulf and creating uncertainty over Gulf oil and gas development. This uncertainty and instability are forcing industry participants to reevaluate their plans and investments and are thus beginning to chill development of oil and gas resources in the Gulf.

12. The United States's ability to extract oil from the Gulf of America is a matter of national security. The United States relies on domestic oil production to support military operations and readiness. If our ability to extract Gulf oil is disrupted, our ability to support military operations and readiness will also be disrupted.

13. Disrupting our domestic oil production would also benefit our adversaries and hurt our allies. If the United States exports less oil, countries like Russia and Iran will generate more revenue from their own oil exports. This, in turn, would blunt U.S. sanctions efforts and bolster these countries' economies and geopolitical standing.

14. At the same time, economic security is fundamental to national security, and the U.S. economy would suffer from disruptions to oil and gas production in the Gulf. If oil and gas activities in the Gulf are disrupted, complex refining infrastructure concentrated along the Gulf Coast in Texas, Louisiana, Alabama, and Mississippi would lose its primary feedstock, and domestic gasoline prices would spike.

15. The non-use of this critical infrastructure also increases risks of catastrophic failures that threaten human health and safety and economies throughout the Gulf coast states and beyond.

16. If a significant source of the United States's domestic oil production were disrupted, the country's ability to absorb unexpected energy shocks and to support our allies would suffer.

17. Further, risks that threaten oil production are themselves highly problematic because they divert resources and require redundancies. It is crucial to take all necessary action to eliminate risks to oil production in the Gulf.

18. Congress recognized that there could be situations in which the application of the ESA threatens national security interests. It thus requires the Endangered Species Committee (ESC) to grant, pursuant to section 7(h) of the ESA, "an exemption for any agency action if the Secretary of [War] finds that such exemption is necessary for reasons of national security." *See* 16 U.S.C. § 1536(j).

19. Given the critical role that oil and gas from the Gulf plays in our national security, I find that an "exemption is necessary for reasons of national security." *See id.*

<u>Domestic Energy and Its Critical Role in National Security</u>

20. Congress has long recognized the importance of Gulf oil and gas production, finding that oil and gas development on the outer continental shelf is needed to "assure national security." *See* 43 U.S.C. § 1802(1).

21. The 2025 National Security Strategy of the United States (2025 NSS) echoed Congress's recognition and identified energy independence, including the reshoring of oil and gas production, as a "top strategic priority."[2]

22. "An affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation."[3]

23. Affordable and abundant domestic energy facilitates increased energy exports, which "deepen relationships with allies while curtailing the influence of adversaries," and ensures our ability to "defend our shores" and "project power" abroad.[4] It likewise "reduce[s] costs for American consumers and business, fuel[s] reindustrialization," and helps maintain America's strategic "advantage in cutting-edge technologies."[5]

24. It is thus the policy of the United States "to protect the United States's economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible in every State and territory of the Nation."[6]

_____

[2] 2025 NSS at 14.
[3] Exec. Order No. 14156, *Declaring a National Emergency*, 90 Fed. Reg. 8433 (Jan. 20, 2025).
[4] 2025 NSS at 14.
[5] *Ibid.*
[6] Exec. Order No. 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 20, 2025).

3

CUI

## Regulatory Background

25.  Federally authorized Gulf oil and gas operations must comply with, among other laws, the ESA. *See* 16 U.S.C. § 1531 *et seq.* BOEM and BSEE regulate these activities and must ensure the activities are not likely to jeopardize the continued existence of any endangered or threatened species. *See id.* § 1536(a)(2). They do so by consulting with FWS or NMFS (depending on the species). *See id.* § 1536(a).

26.  The ESA consultation process—including the resulting biological opinions and associated incidental take statements—provide Federal agencies and regulated third parties with the means to ensure compliance with the ESA's substantive mandates. Without operative ESA consultation decisions and incidental take statements, Federal agencies and regulated third parties would be subject to potential civil and criminal liability. 16 U.S.C. § 1536(a)(2), (o)(2); *id.* § 1540.

27.  On 20 May 2025—roughly five years after its previous biological opinion was adopted and more than two-and-a-half years after reinitiating consultation—NMFS issued its current biological opinion considering the effects on certain species and habitats of "all activities regulated by" BOEM and BSEE "and associated with the Outer Continental Shelf" Oil and Gas Program in the Gulf.[7]

28.  FWS issued its biological opinion (on 20 April 2018) and completed reinitiated ESA consultations (on 18 March 2025) over the effect of Gulf oil and gas activities on species under its jurisdiction.

29.  These opinions and their incidental take statements are a linchpin for Gulf oil and gas operations.[8] They allow Federal agencies to issue permits, approve plans, and take other similar actions necessary for Gulf oil and gas development in compliance with the ESA. They likewise protect agencies and operators from civil and criminal liability when acting in compliance therewith.

30.  In short, all oil and gas operations in the Gulf of America rely on these ESA consultation decisions and actions.

## Attempts to Invalidate Agency Actions That Are Critical for Gulf Oil and Gas Activities

31.  Pending litigation in multiple districts challenges the legality of the operative biological opinions, incidental take statements, and other ESA consultation decisions.[9] At least some of these suits seek to vacate these agency actions.

---

[7] Biological Opinion at 2-4; 160-70; 281; 537; 545; 568.
[8] *Sierra Club v. NMFS*, 25-cv-1627 (D. Md.) (ECF No. 78-2 at 4).
[9] *See, e.g., Ctr. for Biological Diversity v. Burgum*, 24-cv-990 (D.D.C.); *Sierra Club v. NMFS*, 25-cv-1627 (D. Md.); *State of La. v. NMFS*, 25-cv-691 (W.D. La.); *Healthy Gulf v. Burgum*, 25-cv-4016 (D.D.C.).

4

CUI

CUI

32.  The pending legal challenges are just the latest attempt to invalidate these actions.  Previous biological opinions and incidental take statements have been the subject of litigation for more than five years.

33.  In 2020, NMFS's previous biological opinion over Gulf oil and gas development was challenged.  During that lawsuit, BOEM and BSEE reinitiated consultation in October 2022 to address new information and changes to the action. The agencies also agreed to implement certain measures intended to protect the Rice's whale.

34.  As soon as those new measures were included in a lease sale, they were immediately challenged in a separate lawsuit and invalidated because, among other things, the agency did not justify its decision to implement these protective measures.[10]

35.  In turn, while the reinitiated ESA consultation was ongoing, the original litigation resumed. In 2024, the court found that NMFS's 2020 biological opinion and incidental take statement were unlawful because they underestimated potential risks to protected species and were insufficiently protective of the Rice's whale.

36.  The court held that "binding precedent" required it to fully vacate those actions instead of merely remanding them to NMFS for further consideration.[11]  That court therefore ordered vacatur of the then-operative biological opinion and incidental take statement, but it ultimately delayed the effective date of its order for nine months while the agency attempted to address the court's concerns.

37.  In May 2025, NMFS issued its current biological opinion and incidental take statement, thereby responding to the court's order and completing the reinitiated consultation that began in October 2022.

38.  Within hours, it was challenged in two separate ESA suits, one of which was brought by the same plaintiffs that challenged the 2020 biological opinion.  That case is pending before the court that vacated NMFS's biological opinion in 2024.[12]

39.  In the other case, a court recently held that certain aspects of NMFS's 2025 biological opinion and incidental take statement are unlawful as overly protective of the Rice's whale, and it remanded the decisions back to the agency without vacating them.[13]

---

[10] *Louisiana v. Haaland*, No. 2:23-CV-01157, 2023 WL 6450134, at *9 (W.D. La. Sept. 21, 2023) ("This is the only scientific justification offered for the challenged provisions, representing an unexplained about-face from a position taken by the agency just months before.  BOEM offered no explanation for its new stance on the same body of evidence, let alone using this pivot to justify measures pending a final determination by NMFS.").

[11] *Sierra Club v. NMFS*, 797 F. Supp. 3d 440, 494-95 (D. Md. 2024), *amended*, 2024 WL 6817999 (D. Md. Oct. 21, 2024).

[12] *Sierra Club v. NMFS*, 25-cv-1627 (D. Md.).

[13] *Louisiana v. NMFS*, No. 2:25-CV-00691, 2026 WL 184236 (W.D. La. Jan. 23, 2026).

5

CUI

40. In addition to these two cases over the NMFS biological opinion, there is separate litigation challenging FWS's biological opinion as failing to consider and mitigate the effects of oil and gas activities on protected species.[14]

Attempts to Invalidate These Actions Threaten Oil and Gas Activities

41. These recurring legal challenges, which are based on alleged ESA violations, threaten oil and gas activities in the Gulf in many ways.

42. First, by asking courts to vacate the underlying biological opinions and incidental take statements, these lawsuits threaten to effectively halt all oil and gas activities in the Gulf.

43. Vacatur would prevent BOEM and BSEE from issuing new approvals for Gulf oil and gas development.  Losing programmatic approval for Gulf activities through vacatur would force BOEM and BSEE, which review approximately 6,000 applications for Gulf activities annually, to halt these activities or undergo case-by-case ESA review, creating insurmountable burdens and freezing approval decisions.[15]

44. Separately, vacatur would call into question existing authorizations associated with thousands of active leases, facilities, wells, and miles of pipeline.

45. Vacatur would also strip liability protections from agencies and operators, exposing them to civil and criminal penalties.

46. Operators would confront "a no-win decision": they must either (a) "walk away from ongoing platform operations, ongoing drilling operations, or required pipeline maintenance activities which will lead to massive financial losses, breach of contract claims, and other negative consequences and will also create significant worker and public health and safety issues and industrial damage that could follow from a shutdown of essential operations; or (b) continue the operations covered by the 2025 [biological opinion] and risk violating the ESA (subjecting themselves to potential federal enforcement actions or citizen suits under the ESA and reputational damage)."[16]

47. Second, judicial remedies short of immediate vacatur—including deferred vacatur, remands with deadlines, injunctive relief, rulings that effectively mandate more restrictive operations, and retained court jurisdiction—also threaten to substantially impair oil and gas development by reordering agency priorities, diverting personnel from essential statutory functions, constraining what agencies can do on remand, disincentivizing operations, and introducing corresponding limits on oil and gas development in the Gulf.

---

[14] *Ctr. for Biological Diversity v. Burgum*, 24-cv-990 (D.D.C.).
[15] *Sierra Club v. NMFS*, No. 25-cv-01627 (D. Md.) (ECF No. 76-1 at 46-47); *Sierra Club v. NMFS*, No. 20-cv-3060 (ECF No. 211-4 at 2-3).
[16] *Sierra Club v. NMFS*, No. 25-cv-01627 (D. Md.) (ECF No. 78-2 at 7) and (ECF No. 78-4 at 6 (calling this "an impossible situation")).

48. Parallel litigation across multiple districts compounds these dangers: it could lead to inconsistent or conflicting judgments that agencies cannot simultaneously obey.  By siphoning the same agency resources that are used to review and grant oil and gas approvals, these remedies will slow down the approval process.  That will slow down development and, in turn, depress production.[17]

49. Third, the litigation injects uncertainty and instability into Gulf development and sows confusion among both the regulated entities and the agencies that regulate those activities.

50. The current trend is toward more litigation, not less.  For example, NMFS's 2020 biological opinion and incidental take statement were challenged in one lawsuit, but its current decisions were challenged in two.  And litigants are now using the ESA to attack post-opinion implementation actions, like lease sales, in different forums.[18]  There is no reason to think that trend will abate.

51. Regulatory uncertainty and instability also disrupt oil operations that require advanced planning, which, in turn, curtail oil and gas development.[19]  Regulatory certainty and stability are important because developers, who invest billions of dollars and need regulatory certainty, will look to invest in other countries if the U.S. oil and gas landscape is unpredictable.[20]

52. In sum, the consulting agencies that issue the decisions that all Gulf oil and gas activities rely on are perpetually defending their decisions in litigation or redoing them after successful legal challenge.  This creates significant risk, and it generates uncertainty and instability for both the oil and gas industry, which relies on governmental approvals, and the agencies that issue those approvals.

<u>Coordination to Evaluate the Threat Created by the ESA</u>

53. On 26 January 2026, the Department of the Interior contacted the Department of War regarding the pending litigation, which actively jeopardizes the United States's national security interests by threatening oil and gas activities in the Gulf.[21]

54. Department of War staff coordinated with the Department of Energy's Office of Policy and Energy Information Administration, as well as the Office of the Deputy Under Secretary of War for Acquisition & Sustainment and Defense Logistics Agency, to understand the risk

---

[17] *See, e.g.*, *Sierra Club v. NMFS*, No. 25-cv-01627 (D. Md.) (ECF No. 78-5 at 4) ("Delays would harm virtually all of Chevron's Gulf activities, which depend on the ability to efficiently obtain new and revised permits and approvals from BOEM and BSEE.").

[18] *Healthy Gulf v. Burgum*, No. 25-cv-4016 (D.D.C.).

[19] *See, e.g.*, *Sierra Club v. NMFS*, No. 25-cv-01627 (D. Md.) (ECF No. 78-5 at 4) ("Regulatory chaos and uncertainty threaten Chevron's Gulf of America business, which is complex and involves complicated logistics that require significant advance planning. Chevron plans many geophysical, exploration, production, development, and decommissioning activities a year or more in advance.").

[20] *See, e.g.*, Ariana Hurtado, *Offshore leasing uncertainty drives higher energy costs for US consumers, CEA says*, Offshore (Mar. 4, 2026).

[21] *See* Email from U.S. Department of Interior to U.S. Department of War (Jan. 26, 2026).

CUI

that stopping all oil and gas activities in the Gulf would pose to national security and military readiness.

55. The Department of Energy's memorandum and market analysis are attached. Department of War staff also coordinated with FWS, NMFS, BOEM, and BSEE to understand the effect that litigation has on those agencies and industry operators. In turn, I consulted with appropriate Department of War staff and reviewed relevant documentation to evaluate how the application of the ESA to oil and gas activities in the Gulf affects national security.

<u>Effects on National Security</u>

56. The cessation of oil and gas production in the Gulf of America would significantly jeopardize American energy independence and, as a result, the national security.

57. The termination or diminution of Gulf of America oil and gas production would directly benefit adversaries by driving up spot prices and boosting oil revenues for exporters like Russia and Iran. This could undermine U.S. sanctions and support our adversaries' struggling economies.[22]

58. Ending or diminishing Gulf oil production would also diminish a critical national security buffer—the United States's status as a net energy exporter—as halting Gulf production would "cut[] crude exports by half (4.1 million [barrels per day] in 2024)."[23] Among other things, this would significantly "reduce[] the country's ability to absorb shocks, support allies, and weaken[] U.S. energy and national security."[24]

59. China, which typically expands strategic crude oil stockpiles in response to higher spot prices, would further inflate prices by up to 10%, likely increasing revenues for countries like Russia and Iran, from whom China heavily imports. The resulting supply vacuum would incentivize increased production by Russia, Iran, and OPEC nations, amplifying cost and volatility impacts and undermining U.S. foreign and trade policy.

60. Economic effects of halting or diminishing oil and gas production in the Gulf would make the United States geopolitically weaker, and that would harm our national security. Geopolitical weakness would make us less financially flexible, impair our ability to absorb external shocks, and weaken our influence on international decisions.

61. Halting or throttling oil and gas production in the Gulf would "immediately increase wholesale prices, shifting global markets, increase retail prices for American consumers, and disrupt U.S. jobs."[25]

---

[22] DOE, *Gulf of America Energy Security* at 2.
[23] *Id.*
[24] *Id.*
[25] *Id.* at 1-2.

8

CUI

62. The Energy Information Administration (EIA) assesses that disruption of Gulf crude oil production would increase the Brent crude oil spot price an average of 19–24% above the baseline forecast in 2027.[26]

63. Retail gasoline prices would increase by approximately 16–21% above the baseline forecast in 2027; diesel fuel prices by approximately 16–21% above the baseline forecast in 2027; and jet fuel prices 28–37% above the baseline forecast in 2027.[27]  These impacts would be most acute for lower- and middle-income households, which spend a larger share of income on gasoline and have less flexibility to absorb price increases.

64. Higher fuel costs would also ripple through the broader economy by raising transportation and goods prices, contributing to inflationary pressure.

65. Attempts at replacing production from the Gulf of America would be severely constrained.

66. Domestically, the Permian Basin is the only region with sufficient production scale, but Permian wells produce unconventional oil requiring horizontal drilling and hydraulic fracturing, with approximately 70% first-year production declines that require continuous drilling of thousands of new wells annually at significantly increased cost.

67. Internationally, Canada and Mexico could collectively provide only approximately 125,000 barrels per day of additional crude—far short of the 2 million barrels per day needed.

68. The Strategic Petroleum Reserve (SPR) is similarly constrained: pipeline limitations along the Gulf Coast reduce actual drawdown capacity to approximately 625,000 barrels per day, well below the SPR's 2.7 million barrels per day design capability.

69. Even combining international imports with maximum SPR drawdown, only approximately 625,000 barrels per day could be made available—less than one-third of the lost production.

70. Drawing down the SPR would also directly threaten our national security because it would hamstring our ability to respond to emergencies, natural disasters, and other unexpected events.  Foreign adversaries, in turn, may try to exploit this vulnerability.

71. A disruption to oil and gas production in the Gulf would also disrupt our military's ability to get fuel to military assets.

72. Crude oil from the Gulf is refined by Gulf refineries, many of which the Department of War relies on.  For example, seven Gulf refineries supply fuel that supports 85 military bases.

---

[26] DOE, *Market impact analysis of the disruption to federal offshore Gulf of America crude oil and natural gas production* at 3.

[27] *Id.* A short-term cessation of oil and gas activities in the Gulf would lead to more modest increases, and prices would return to the baseline forecast more quickly.  That said, "[a] more profound economic impact is expected at the national and community level" such that "even if GOA crude production were to be halted for a more finite duration, the economic consequences risk being profound."  *See* DOE, *Gulf of America Energy Security* at 5–6.  And a short-term interruption would still increase our reliance on foreign oil and reduce U.S. energy independence, *see id.* at 6, which would benefit foreign adversaries and threaten our national security.

9

CUI

Many of these refineries produce specialized fuel that our military needs, including types of jet fuel that rely on specific refining processes that are concentrated in Gulf refineries.

73. Gulf Coast refineries are optimized to process the medium-to-heavy sour crude produced offshore; substituting lighter domestic crude would result in lower efficiency, reduced yields of high-value products such as diesel and jet fuel, and higher operating costs.

74. Diesel fuel and jet fuel prices would be impacted more than gasoline prices due to the higher diesel and jet fuel yield from the disrupted Gulf crude oil types. This would further tighten supply of refined products, exacerbate consumer price increases, and reduce the energy independence and security of U.S. Gulf Coast refineries by increasing their dependence on imported crude from Canada, the Middle East, or South America.

75. A disruption to oil and gas activities would thus force the Department of War to rework its fuel supply chain, which would create uncertainty and vulnerabilities that would harm our national security by negatively affecting operational readiness and mission effectiveness.

76. Even if oil and gas production resumed in the future, a sudden and prolonged hiatus could cause catastrophic damage to vital infrastructure. Wells and pipelines could collapse because, without the necessary agency approvals, operators may be unable or unwilling to maintain equipment to avoid these events.[28]

77. In addition to the nationwide economic issues potentially caused by a decrease in production and increase in oil and gas prices, the companies operating in the Gulf could face billions of dollars in losses, further harming the American energy sector, which is key to national security.[29]

78. The national security threat is not limited to the risk of outright vacatur. Judicial remedies short of immediate vacatur would depress oil production in several ways and implicate the national-security concerns discussed above.

79. First, diverting agency resources to work on remands would slow down approvals and exacerbate current legal and regulatory instability for oil and gas producers, thereby decreasing oil and gas development and production.

80. Second, judicial decisions that limit agency discretion and lead to more restrictive biological opinions and incidental take statements would negatively impact oil and gas producers' willingness to apply for permits and their ability to extract.

81. Third, regulatory uncertainty and instability interfere with oil and gas development by disrupting operations that require long-term planning. Disruptions at earlier stages of planning affect later stages, which leads to less oil and gas development.

---

[28] *Sierra Club v. NMFS*, 25-cv-01627 (D. Md.) (ECF No. 76-4 at 3-6).
[29] *Sierra Club v. NMFS*, No. 25-cv-01627 (D. Md.) (ECF No. 78-1 at 43-44).

10

CUI

CUI

82. Finally, uncertainty, instability, and a more restrictive regulatory environment would also stifle investment and have other chilling effects that would negatively impact oil and gas development.

83. Application of the ESA to oil and gas activities in the Gulf, including ongoing and inevitable future ESA litigation, poses an unacceptable risk to the national security of the United States. This is true regardless of the remedy imposed by a court in any particular ESA lawsuit.

84. The risk of disrupting oil and gas production weakens the supply chain and requires the United States to divert resources for contingency planning. This is particularly untenable given the global volatility in oil and gas production and supply. For example, during the current conflict with Iran, there have been challenges with shipping through the Strait of Hormuz. Similarly, Russia's actions have disrupted oil supply in Europe for several years.

85. Unplanned oil disruptions have historically occurred throughout the world and will continue to do so indefinitely.[30] It is unacceptable to our national security to allow the ESA to create additional risk to the U.S. production and supply chain in the Gulf of America.

### National Security Exemption to the ESA

86. Congress included a national security exemption provision in the ESA to address situations like this.

87. In general, ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), requires each Federal agency to ensure that its actions are not likely to "jeopardize" the existence of endangered or threatened species or destroy or adversely modify the critical habitat of such species "unless such agency has been granted an exemption" by the ESC.

88. Congress recognized that there may be times when that statute's operation harms national security, including the Department of War's mandate to defend the homeland and the American people. Thus, Congress prudently required that the ESC "grant an exemption" from the ESA's requirements "for any agency action if the Secretary of [War] finds that such exemption is necessary for reasons of national security." 16 U.S.C. 1536(j).

89. An exemption is necessary here for reasons of national security.

90. The agency action under consideration—all oil and gas activities in the Gulf of America—encompasses the full suite of agency actions that BOEM and BSEE identified when initiating and pursuing ESA consultation with NMFS, which NMFS then reviewed in its 2025 biological opinion and FWS reviewed in the 2018 and 2025 consultation decisions.

---

[30] Energy Information Administration, *Short Term Energy Outlook* (Feb. 5, 2026) https://www.eia.gov/outlooks/steo/report/global_oil.php.

CUI

CUI

91. First, exempting this agency action from the ESA would remove the persistent threat of halting oil and gas activities in the Gulf created by litigation challenging agency decisions and actions under the ESA.

92. As explained above, vacatur would have drastic negative effects on our national security: it would benefit our adversaries, including Iran, Russia, and China; it would reduce our country's ability to respond to shocks and unexpected world events; it would disrupt the supply chains that our military relies on, which would hurt military readiness and create vulnerabilities; and it would make us a geopolitically weaker country.

93. It is necessary for national security to eliminate the threat of vacatur, rather than waiting to see if it materializes. I do not need to wait to see whether the ESA will be used to block all oil and gas development and production in the Gulf before acting to protect national security. As in other contexts, I can act now to remove a significant threat to national security before harm occurs.

94. In my view, it is necessary to act now. The risk to oil development and production in the Gulf of America has been building for years, and energy independence and resilience are critically important.

95. Application of the ESA to oil and gas activities in this critically important location threatens energy independence and resilience. In my judgment, it is critical to our national security to remove that threat without delay.

96. Second, it is crucial to exempt the agency action now to avoid judicial remedies that divert agency resources away from managing the Gulf's oil and gas program. By requiring the agencies to devote significant resources to redoing the ESA consultation documents, the agencies are unable to maximize the Gulf's oil and gas production.

97. These remedies also constrain the agencies' decisions and can lead to more restrictive operations. That, too, interferes with our ability to safeguard and expand oil and gas production at a time when it is necessary to do so. Again, I do not need to wait for the next judicial remedy, and I urge the ESC to act now to remove this risk to national security.

98. Third, it is necessary to remove the acute regulatory uncertainty that is beginning to chill oil and gas development in the Gulf.

99. Environmental organizations are not only leveraging existing litigation but actively threatening new lawsuits to block planned development, forcing industry participants pursuing costly, multi-million-dollar projects to actively explore alternative ways to insulate their operations from litigation risk. This uncertainty is driving conversations between industry and federal regulators at BOEM and BSEE that would not otherwise occur, as industry participants grapple with the real possibility that permits, plans, and approvals could be invalidated or delayed indefinitely.

CUI

CUI

100. Industry trade groups have stated that this kind of regulatory instability undermines the certainty that companies need to commit billions of dollars to offshore energy production, and that without it, investment migrates to competing basins like Brazil and Guyana.[31]  The chilling effect is not hypothetical—it is manifesting now through heightened industry concern and reconsideration of development strategies.  I find it necessary for national security to remove this chilling effect on oil and gas development in the Gulf.

101. While the threat of vacatur is the most acute threat that ESA litigation creates, each of the three litigation threats (vacatur, remedies short of vacatur, and uncertainty and instability) is an independent basis for exempting the agency action from the ESA.

102. At the same time, protected species will continue receiving appropriate protections because the underlying agency action includes those mitigation and protection measures that BOEM, BSEE, NMFS, and FWS identified as necessary when developing the proposed action that is the subject of this determination.  Exempting the agency action now will not materially increase the risk to protected species.  And, in any event, an exemption is necessary for reasons of national security.

## Finding

103. I find that it is necessary for reasons for national security to exempt from the Endangered Species Act the proposed action reviewed in NMFS's 2025 biological opinion and in FWS's 2018 and 2025 consultation decisions, which covers all oil and gas exploration and development activities associated with BOEM and BSEE's Outer Continental Shelf Oil and Gas Program.



---

[31] *See* Hurtado, *supra* note 20.

CUI